**AFFIRM; and Opinion Filed May 29, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-12-01133-CV

### DALLAS AREA RAPID TRANSIT, Appellant
### V.
### DAVID MORRIS, Appellee

**On Appeal from the 193rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-11-07709**

## OPINION

Before Justices FitzGerald, Fillmore, and Evans
Opinion by Justice Fillmore

Appellee David Morris was injured when he fell while riding on a bus operated by appellant Dallas Area Rapid Transit ("DART"). Morris sued DART alleging that his injuries were caused by the negligent operation of the bus. After a jury trial, the trial court rendered judgment for Morris based on the jury's verdict. In four issues, DART asserts the trial court erred by (1) including in the jury charge a "high degree of care" standard applicable to a common carrier; (2) refusing to include a jury instruction on unavoidable accident; (3) excluding evidence of Morris's past medical history; and (4) permitting improper and incurable jury argument. We affirm the trial court's judgment.

# BACKGROUND

Morris rode a DART bus to work every day for over a decade. On January 12, 2010, Morris boarded a DART bus at his regular stop. Morris testified at trial that he usually grabbed the handrail when he boarded the bus in the morning and did so on the day of the accident. He climbed the steps to the fare box at the right of the driver's seat and slid his bus pass through the fare box reader. He turned around to see where he could sit. He took one step toward the seats, but had not yet crossed a yellow line near the fare box when the bus lurched forward. He testified, "suddenly the bus lurched forward with a jerking motion which threw me forward." He tried to regain his balance, but the bus jerked again and he fell, breaking his leg in three places. Morris testified unequivocally that he had not crossed the yellow line. He was taken to the emergency room at Parkland Hospital, where his leg was reset. He testified that the break and the resetting were extremely painful. He had surgery later the same day, and was in the hospital for a total of five days. He used a wheelchair for eight weeks after his discharge from the hospital. He returned to the hospital twice for infections around the surgical site. He missed approximately 200 hours of work, and he lost wages of about $3,500 "after taxes." His past medical expenses were approximately $40,000. At the time of trial, Morris had returned to work but still suffered pain from one of the fractures that had not healed.

Rickey Nelson was the driver of the bus. At trial, Nelson testified that behind the driver's seat on the bus, there was a yellow line that crossed the aisle. He confirmed DART's policy that all passengers must be behind the yellow line when the bus starts to move. He testified that Morris entered the bus and passed him. He heard a thump, turned around, and saw Morris on the floor of the bus. Nelson thought Morris "just lost his footing;" there was "no jerk, no lunge" of the bus as it left the bus stop. He denied that Morris appeared unsteady on his feet, stating "[h]e's pretty sturdy." Nelson called "dispatch," who apparently called an ambulance.

Fellow bus passengers Carla Norman and Nataki Johnson also testified at trial. Both witnessed Morris's fall. Both testified that the bus lurched or jerked causing Morris to stumble and fall. They both testified that the fall occurred before or just as Morris crossed the yellow line. Johnson testified that Morris's leg "was clearly broken."

All of the witnesses admitted that there were railings in the bus but Morris did not use them. Morris acknowledged that there were railings throughout the bus to hold onto, and that he had used them on the day of the accident when boarding the bus. However, he did not grab a rail after he scanned his bus pass.

Morris suffered a stroke in 2006. Although the medical records relating to his fall on the bus mentioned his stroke in his medical history, none of the records cited the stroke or any residual effects from it as contributing to Morris's fall. DART did not offer any evidence or any expert opinion connecting the stroke to Morris's fall.

The jury found that both Nelson and Morris were negligent. The jury found Nelson to be 75 percent responsible and Morris to be 25 percent responsible. The jury awarded $40,925.95 for past medical expenses and $4,053.28 for past loss of earning capacity, the amounts requested by Morris. The jury also made three awards of $45,000 each for past physical pain, mental anguish, and physical impairment, and three awards of $75,000 each for future physical pain, mental anguish, and physical impairment. The jury awarded zero damages for both past and future disfigurement. The trial court rendered judgment on the jury's verdict and in accordance with the Texas Tort Claims Act. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.001–101.109 (West 2011 and Supp. 2013). The trial court's judgment recited that the total damages awarded by the jury to Morris were $303,734.32 after reducing the award by 25 percent for Morris's comparative negligence. The judgment also recited that pursuant to section 101.023(b) of the Texas Civil Practice and Remedies Code, Morris's actual damages "are capped at $100,000."

–3–

*See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.023(b) (limiting liability of unit of local government to money damages in a maximum amount of $100,000 for each person). The trial court denied DART's motion for new trial. This appeal followed.

## JURY CHARGE

In its first and second issues, DART complains of errors in the jury charge. We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006); *Bryan v. Watumull*, 230 S.W.3d 503, 508 (Tex. App.—Dallas 2007, pet. denied). Submission of the charge is the trial court's responsibility, and the trial court is given wide latitude to determine the propriety of explanatory instructions and definitions. *Spencer v. Eagle Star Ins. Co. of America*, 876 S.W.2d 154, 158 (Tex. 1994); *H.E. Butt Grocery Co. v. Bilotto*, 985 S.W.2d 22, 23 (Tex. 1998). Rule 277 affords the trial court considerable discretion in deciding what jury instructions are necessary and proper. *See* TEX. R. CIV. P. 277 (court shall submit such instructions and definitions as shall be proper to enable jury to render a verdict); *Bryan*, 230 S.W.3d at 508. For an instruction to be proper, it must: (1) assist the jury, (2) accurately state the law, and (3) find support in the pleadings and evidence. *Id.* (citing rules 277 and 278, Texas Rules of Civil Procedure).

### Standard of Care

The first question in the jury charge inquired whether "the negligence, if any, of those named below proximately cause[d] the occurrence in question." The jury was given separate blanks for Nelson and Morris and was asked to answer "yes" or "no" for each. Several instructions accompanied this question, including a definition for "high degree of care." The trial court instructed the jury:

> "HIGH DEGREE OF CARE" when used with respect to the conduct of Rick[e]y Nelson means that degree of care that would

–4–

> be used by a very cautious, competent, and prudent person under the same or similar circumstances.

DART makes two complaints about this instruction. First, it argues that the instruction was an incorrect statement of the law, because the "high degree of care" standard applies only to common carriers, and DART is not a common carrier. Second, DART contends that because Morris failed to plead this standard of care in his petition, it was improper to include the instruction in the charge to the jury.

We first conclude that the "high degree of care" standard applies to DART because DART is a common carrier. Although no appellate court has previously held explicitly that DART is a common carrier, several courts have applied the high degree of care standard to DART or a similar transit authority. *See, e.g., City of Dallas v. Jackson*, 450 S.W.2d 62, 63 (Tex. 1970) (bus company "as a carrier of passengers, is under a duty to exercise such a high degree of foresight as to possible dangers and such a high degree of prudence in guarding against them, as would be used by a very cautious, prudent and competent man under the same or similar circumstances"); *Dallas Area Rapid Transit v. Perkins*, No. 05-94-01557-CV, 1995 WL 379247, at *1 (Tex. App.—Dallas May 30, 1995, no writ) (not designated for publication) (in context of passenger suit for injuries sustained on DART bus, "high degree of care" standard applied without discussion to DART as common carrier); *Johnson v. Metro. Transit Auth.*, No. 01-99-00978-CV, 2001 WL 1243646, at *4 (Tex. App.—Houston [1st Dist.] Oct. 18, 2001, pet. denied) (not designated for publication) (where passenger alleged injury on METRO bus, trial court did not err by submitting pattern jury charge on high degree of care for common carrier). "It is well settled that common carriers are held to a higher standard of care when transporting passengers." *Speed Boat Leasing, Inc. v. Elmer*, 124 S.W.3d 210, 212 (Tex. 2003) (citing *Mount Pleasant Indep. Sch. Dist. v. Lindburg*, 766 S.W.2d 208, 213 (Tex. 1989) and *Dallas Ry. & Terminal Co. v. Travis*, 78 S.W.2d 941, 942 (Tex. 1935)).

The supreme court has defined "common carriers"[1] as "those in the *business* of carrying passengers and goods who hold themselves out for hire by the public." *Id*. (citing *Lindburg*, 766 S.W.2d at 213). In *Elmer*, the supreme court instructed that "[w]hen determining whether someone who provides transportation is a common carrier, we look to their primary function." *Id.* at 213. The court explained, "[i]t must be determined whether the *business* of the entity is public transportation or whether such transportation is 'only incidental' to its primary business." *Id.* The court noted that "[t]he term has been held to include railroads, buses, airplanes, taxis, street cars, and other vehicles." *Id.* at 212–13 (citing *Howell v. City Towing Assocs., Inc.*, 717 S.W.2d 729, 733 (Tex. App.—San Antonio 1986, writ ref'd n.r.e.)). Because the primary function of the speed boat operator in *Elmer* was to entertain rather than "to transport from place to place," it was not a common carrier. *Id.* at 213–14. Similarly, the primary purpose of the school district in *Lindburg* was not "the business of carriage for hire," but "to further the educational needs of the citizens within the district." *Lindburg*, 766 S.W.2d at 213.

DART makes several arguments in support of its contention that it is not a common carrier: (1) the Texas Tort Claims Act's limited waiver of immunity for personal injury arising from the negligent operation of a motor-driven vehicle[2] does not impose common carrier status or a "high degree of care" standard on the governmental entity; (2) as a "regional transportation authority" under the Texas Transportation Code,[3] DART is not operated for a profit; is funded in part by grants and tax dollars; and the fares charged do not equal the cost to provide the service;

---

[1] In *Elmer*, the supreme court explained that although the Texas Transportation Code does not define common carriers, a predecessor statute defining the duties and liabilities of a common carrier included "railroad companies, and other carriers of passengers, foods, wares, merchandise for hire, within this state, on land, or in boats or vessels on the waters entirely within this state." *Elmer*, 124 S.W.3d at 212 (quoting TEX. TRANSP. CODE ANN. § 5.001 revisor's note).

[2] *See* TEX. CIV. PRAC. & REM. CODE § 101.021(1) (West 2011) (governmental unit is liable for personal injury proximately caused by wrongful act, omission, or negligence of employee acting within scope of employment if personal injury arises from operation or use of motor-driven vehicle and employee would be personally liable to claimant according to Texas law).

[3] Section 452.056 of the Texas Transportation Code permits a regional transportation authority to "own, operate, and maintain a public transportation system in the territory of the authority." *See* TEX. TRANSP. CODE ANN. § 452.056 (West 2013). "Public transportation" is defined as "the conveyance of passengers and hand-carried packages or baggage of a passenger by any means of transportation." TEX. TRANSP. CODE ANN. § 452.001(9).

and (3) there is nothing in the record in this case to establish that DART is in the "business" of carrying passengers for hire because there is no evidence that Morris paid a fare to ride the bus on the day in question. We reject these arguments.

First, under the Tort Claims Act, the liability of the governmental unit is determined "according to Texas law." TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(1)(B); *see also Perez v. City of Dallas*, 180 S.W.3d 906, 910 (Tex. App.—Dallas 2005, no pet.) (Tort Claims Act immunity waived "if the governmental unit would be liable to the claimant according to Texas law if it were a private person" under section 101.021(2)). Section 101.021(1)(B) does not provide any standards of care, instead referencing existing principles of Texas law. According to Texas law, if DART is a common carrier, it owes a high degree of care to its passengers. *See Elmer*, 124 S.W.3d at 212.

Second, the amount of profit, cost of providing service, and source of funds are not factors the supreme court has considered in determining whether a party is a common carrier. Instead, as the court explained in *Lindberg*, the decision to impose a heightened standard of care was based "on the nature of the *business* of carriage." *Lindberg*, 766 S.W.2d at 213 (citing *Galveston City Ry. Co. v. Hewitt*, 3 S.W. 705 (Tex. 1887)).[4] "The rationale for holding common carriers to a higher standard is that passengers should feel safe when traveling." *Elmer*, 124 S.W.3d at 212 (citing cases). "Those in the business of carrying passengers and goods who hold themselves out for hire by the public are burdened with the duties of a common carrier." *Lindburg*, 766 S.W.2d at 213 (citing *Mayhew v. McFarland*, 153 S.W.2d 428 (Tex. 1941)).

---

[4] The court in *Hewitt* explained the rationale for the heightened standard of care:

> It is frequently said that a carrier of passengers is bound to exercise a high degree of care for their safety; and that for an injury resulting to them from what is termed negligence or slight negligence the carrier will be liable, and that the duty to exercise extreme care results from the contract of carriage, express or implied. This is true, but it is not the whole truth; for the duty arises from the hazardous character of the business, and the fact that human life is imperiled by it. The contract creates the relation of carrier and passenger, but that is not the main source from which springs the duty of the carrier to exercise a high degree of care.

*Hewitt*, 3 S.W. at 707–08.

DART identifies itself in its brief as a "regional transportation authority," and does not dispute that it holds itself out for hire by the public. *See Elmer*, 124 S.W.3d at 212. It does not contend it has any purpose other than "to transport [passengers] from place to place." *See id.* at 213. In fact, as Morris points out, DART's counsel argued to the jury that "DART is out there attempting to transport people around the Dallas area; that's what regional transportation authorities do, we are a public transportation authority. We transport people by buses and trains." DART's lack of profit and its partial funding through tax dollars does not alter these factors.

Finally, the record reflects that on the day in question, DART was carrying passengers for hire. Morris testified he slid his bus pass "through the fare box reader" when he boarded the bus. Nelson testified that a passenger with a bus pass swipes the pass through a slot in the fare box "just like a credit card." Morris and two other passengers testified that they rode the DART bus to commute to and from work. There was testimony from more than one witness about the fare box on the bus.[5] Other passengers were riding the bus. In sum, the record reflects that DART "engages in the *transportation* of persons or things from place to place for hire and holds [itself] out as ready and willing to serve the public in the branch of transportation for which [it] is engaged." *See id.* at 212. DART is a common carrier.

Next, we consider whether Morris was required to plead the applicable standard of care in his petition. At the charge conference, the trial court identified as a "preliminary issue" whether or not the plaintiff was required to plead the applicable standard of care. The court stated that the plaintiff had requested a trial amendment. Morris's counsel clarified that "plaintiff's initial position [is] that it's not required to request a trial amendment in that

---

[5] In any event, the payment of consideration is "not essential to the establishment of a passenger-common carrier relationship," but is a factor in determining whether such a relationship was created. *Lindburg*, 766 S.W.2d at 213. We also note that under section 452.0611 of the Texas Transportation Code, a person who uses the public transportation systems "and does not possess evidence showing the appropriate fare has been paid" may under certain circumstances commit a criminal offense. *See* TEX. TRANSP. CODE ANN. § 452.0611(d)-(g) (West 2013). DART presented no evidence that Morris was traveling on the bus without paying the appropriate fare.

negligence is negligence, and ultimately the Court makes the determination as a matter of law whether—what standard it falls under." Counsel also argued that "to the extent it's required," plaintiff "orally amends its pleading to plead that Rickey Nelson has a high degree—owes the plaintiff a high degree of care, and that he has to exercise it as such as a very cautious, competent, and prudent person would do under the same or similar circumstances." DART's counsel objected, noting that Morris had neither pleaded the higher standard of care nor requested a jury issue applying it, and DART never consented to try the case "under a higher degree of care for Mr. Nelson." The court explained that it did "not believe . . . the plaintiff has to plead the definition of negligence," and "it's up to the Court to decide what the definition of negligence is, as with any definition, and the definitions can change depending on the particulars of the case." The trial court noted, however, that neither party had cited any controlling case law. The court stated that "to the extent that it is required," it granted the trial amendment, finding no surprise or prejudice. It is not disputed that Morris never proffered this amendment in writing.

A trial amendment must be filed as a written pleading; an oral amendment at trial is insufficient to modify the pleadings. *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 73 (Tex. 2000). Although this defect may be waived by a failure to object, *see id.*, the record reflects that DART did object.[6] Therefore, if Morris was required to plead the standard of care, his oral trial amendment was insufficient to do so.

"Texas follows a 'fair notice' standard for pleading, in which courts assess the sufficiency of pleadings by determining whether an opposing party can ascertain from the pleading the nature, basic issues, and the type of evidence that might be relevant to the

---

[6] Although Morris contended (and DART appeared to concede at oral argument in this Court) that no objection was made, the record reflects objections by DART (1) at the time the oral amendment was made, (2) at the charge conference, and (3) in DART's motion for new trial. DART objected that the "high degree of care" standard was not pleaded; the issue was not tried by consent; and DART was "surprised" by the inclusion of the definition in the charge.

controversy." *Low v. Henry,* 221 S.W.3d 609, 612 (Tex.2007); *see also* TEX. RS. CIV. P. 47(a) (original pleading shall contain short statement of cause of action "sufficient to give fair notice of the claim involved"); 45(b) (pleading shall consist of "statement in plain and concise language of the plaintiff's cause of action;" allegation not objectionable "when fair notice to the opponent is given by the allegations as a whole"). "Rule 45 does not require that the plaintiff set out in his pleadings the evidence upon which he relies to establish his asserted cause of action." *Paramount Pipe & Supply Co. v. Muhr,* 749 S.W.2d 491, 494–95 (Tex. 1988); *see also Leon Cnty. v. Donahoe*, No. 10-09-00010-CV, 2010 WL 486886, at *3 n.2 (Tex. App.—Waco Feb. 10, 2010, no pet.) (mem. op.) (no heightened pleading requirement applies to suits under Texas Tort Claims Act).

The purpose of the fair notice requirement is to give the opposing party information sufficient to enable him to prepare a defense. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 897 (Tex. 2000). A court will look to the pleader's intent "and the pleading will be upheld even if some element of a cause of action has not been specifically alleged." *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex. 1982) (quoting *Gulf, Colo. & Santa Fe Ry. Co. v. Bliss*, 368 S.W.2d 594, 599 (Tex. 1963)). DART did not specially except to Morris's petition on the ground that it failed to allege the applicable standard of care, and in the absence of special exceptions, a petition will be construed liberally in favor of the pleader. *Id.*

DART does not cite authority requiring that a plaintiff plead the applicable standard of care in a negligence claim in order to meet the fair notice requirement of rule 45, and we have found no such authority. Courts have compared the "fair notice" requirement of rule 47 to the "fair summary" requirement for expert opinions in health care liability cases. *See, e.g., Strom v. Mem'l Hermann Hosp. Sys.*, 110 S.W.3d 216, 221–22 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). In *Strom*, the court rejected the argument that the two standards were the same,

–10–

explaining that the health care liability claim "standard for making a good-faith effort to provide a fair summary of the expert's opinions as to the elements of standard of care, breach, and causation *is higher than the 'fair notice' requirement of rule 47*." *Id.* at 222 (emphasis added). This is because the standard of care in a health care liability claim "is defined by what an ordinarily prudent health-care provider or physician would have done under the same or similar circumstances." *Id.* "Whether a defendant breached the standard of care due a patient cannot be determined without 'specific information about what the defendant should have done differently.'" *Id.* (quoting *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001)). And even a "fair summary" is "something less than a full statement of the applicable standard of care and how it was breached." *See id.* (quoting *Palacios*, 46 S.W.3d at 880).

Here, Morris's operative petition gave DART fair notice of his claim. Morris first alleged that DART's governmental immunity was waived under the Texas Tort Claims Act because the claim involved personal injury caused by the negligent operation or use of a motor-driven vehicle by DART's employee. Morris alleged that he "experienced severe personal injuries after entering a DART bus" at a specific stop. He alleged that the driver of the bus "unexpectedly and abruptly took off from the bus stop causing Plaintiff to lose his balance and violently fall to the ground." As a result of the driver's alleged negligence, Morris "sustained serious personal injuries and damages and required extensive medical treatment." Morris then pleaded that DART is a governmental unit that employed the driver to operate the bus, and at the time of the injury, the driver was in the course and scope of his employment. Morris pleaded the driver was negligent by "abruptly" and without warning "lunging the bus forward," failing to wait until Morris reached his seat, and "failing to appropriately and safely operate the DART bus." He pleaded that this conduct was the proximate cause of his injuries and requested

damages. These allegations gave DART fair notice of Morris's claim. TEX. R. CIV. P. 47. *See also Galveston, H. & S.A. Ry. Co. v. Gracia*, 100 S.W. 198, 199 (Tex. Civ. App. 1907, writ ref'd) (plaintiff injured in train derailment was not required to plead specific acts of negligence that might have caused the derailment; allegation that train derailed due to railroad's negligence and plaintiff was injured thereby was sufficient). We conclude that in the absence of a court order granting a special exception, Morris was not required to plead the "high degree of care" standard applicable to a common carrier in his petition.

DART also contends that the trial court erred by including the "high degree of care" instruction in the jury charge where Morris did not first request it. The trial court used the definition of "high degree of care" set forth in the Texas Pattern Jury Charges. *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: General Negligence*, PJC 2.2 (2010 ed.). The comment to the pattern instruction explains that "[a] high degree of care is called for in cases involving the duty of a common carrier to its passengers." PCJ 2.2 cmt. (citing *Dallas Ry. & Terminal Co.*, 78 S.W.2d at 942, and other cases). This instruction was an accurate statement of the law, supported by the pleadings and evidence, that assisted the jury. *See Bryan*, 230 S.W.3d at 508. The trial court did not err by including it in the charge. To the extent DART's argument is construed as asserting that it was error for the judge to include in the charge a definition of the standard of care that had not been submitted by counsel, we disagree. Rule 271 expressly places the burden to prepare the jury charge on the trial court. *See* TEX. R. CIV. P. 271 ("trial court shall prepare and in open court deliver a written charge to the jury"). DART cites no authority for the proposition that the trial court erred by drafting the charge and we know of none. We resolve DART's first issue against it.

**Unavoidable Accident**

DART also complains that the trial court refused its proffered instruction on unavoidable accident. The omission of an instruction is reversible error only if the omission probably caused the rendition of an improper judgment. *Shupe*, 192 S.W.3d at 579. An "unavoidable accident" is "an event not proximately caused by the negligence of any party to it." *Reinhart v. Young*, 906 S.W.2d 471, 472 (Tex. 1995) (quoting *Dallas Ry. & Terminal Co. v. Bailey*, 250 S.W.2d 379, 385 (Tex. 1952)). "An unavoidable accident instruction is proper only when there is evidence that the event was proximately caused by a nonhuman condition and not by the negligence of any party to the event." *Hill v. Winn Dixie Texas, Inc.*, 849 S.W.2d 802, 803 (Tex. 1992) (citing *Yarborough v. Berner*, 467 S.W.2d 188, 190–91 (Tex. 1971)). The instruction "is most often used to inquire about the causal effect of some physical condition or circumstance such as fog, snow, sleet, wet or slick pavement, or obstruction of view, or to resolve a case involving a very young child who is legally incapable of negligence." *Reinhart*, 906 S.W.2d at 472 (citing *Hill*, 849 S.W.2d at 803).

DART argues that "the evidence about how the accident happened was conflicting supporting a possible finding by the jury that no party was negligent in this case and thus the accident was unavoidable." *See id.* (quoting *Yarborough*, 467 S.W.2d at 192) ("The only purpose of the instruction is to ensure that the jury will understand that 'they do not necessarily have to find that one or the other parties to the suit was to blame for the occurrence complained of.'"). The court in *Hill*, however, stated that without evidence that a "nonhuman condition" was a proximate cause, submission of an unavoidable accident instruction is "generally improper." *See Hill*, 849 S.W.2d at 803. The court explained, "[c]ourts should refrain from submitting an unavoidable accident instruction in other circumstances due to the risk that the jury will be

misled or confused by the perception that the instruction represents a separate issue distinct from general principles of negligence." *Id.*

Here, each party offered evidence that the other was negligent, DART by its operation of the bus, and Morris by his failure to grasp the handrails. There was no evidence of any nonhuman condition that might have caused Morris's fall. DART argued, and the jury could have found, that neither party was negligent by answering "no" in both answer blanks of Question 1 of the charge, inquiring whether the negligence, "if any," of Nelson or Morris proximately caused the occurrence in question. Based on the evidence, the jury found otherwise. Because DART's requested instruction on unavoidable accident was not reasonably necessary to enable the jury to render a proper verdict, we conclude the trial court did not abuse its discretion by refusing it. *See* TEX. R. CIV. P. 277; *Shupe*, 192 S.W.3d at 579. We resolve DART's second issue against it.

## EXCLUSION OF EVIDENCE

In its third issue, DART complains of the trial court's refusal to admit records and allow cross-examination on a stroke suffered by Morris in 2006. DART alleges that Morris had "residual right sided weakness and history of other problems including dizziness and problems with his right leg, including abnormality of gait, right hemiparetic gait and right foot drop." The admission or exclusion of evidence is reviewed under an abuse of discretion standard. *See Enbridge Pipelines (E. Tex.) L.P. v. Avinger Timber, L.L.C.,* 386 S.W.3d 256, 262 (Tex. 2012). A judgment will not be reversed based on the admission or exclusion of evidence unless the appellant establishes that (1) the trial court's ruling was in error and (2) the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *See McCraw v. Maris,* 828 S.W.2d 756, 757 (Tex. 1992). A successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence

excluded or admitted. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753–54 (Tex. 1995). When reviewing whether evidence was properly admitted or excluded, the appellate court must review the entire record. *See State v. Cent. Expressway Sign Assocs.,* 302 S.W.3d 866, 870 (Tex. 2009); *Tex. Dep't of Transp. v. Able,* 35 S.W.3d 608, 617 (Tex. 2000).

DART sought to introduce Defendant's Exhibit 27, Morris's medical records from Southwestern Medical Center relating to Morris's 2006 stroke. In argument outside the jury's presence, DART offered the exhibit into evidence. Morris's counsel objected on the basis of relevance, explaining that DART was "trying to say . . . something about the stroke that my client suffered some four years prior to the incident is somehow relevant to this, when the testimony by his own witness was that Mr. Morris was stable and sturdy." DART responded that "based on what Mr. Morris testified to a little while ago, I think that door is wide open that I can question him about things having to do with his [gait], his stability, his unsteadiness." DART argued that "[a]ll this is mentioned in these records." The court asked if DART wanted to question Morris outside the presence of the jury first. When counsel responded, "Not really. I would like to do it in front of the jury," the court stated, "Well, at this point that request is denied because I don't know what the questions are." The court then sustained Morris's objection to Exhibit 27.

After the completion of Morris's testimony, DART made an offer of proof outside the presence of the jury. Morris admitted that he had suffered a stroke in 2006 and received physical therapy. He admitted that after the stroke he was "unable to walk with one foot in front of the other for some period of time," and that he fell more than once. He admitted to dizziness after the stroke, but attributed it to medication. He also admitted that after the stroke, his right foot dragged occasionally. He testified that when the accident occurred in 2010, however, his walk was "perfectly normal," and his foot was not dragging.

–15–

The court asked whether there was any reference to the stroke in any other exhibit. DART pointed to four references in Exhibits 2 and 3, the emergency and other medical records from Morris's fall on the bus, that mentioned the stroke, as well as one reference to "residual right-sided weakness." Morris's counsel objected that DART had violated the court's order in limine regarding reference to the stroke, and also objected on the basis of relevance:

> MR. KELLER: Judge, it doesn't make any difference. . . . There's no evidence that he was suffering from any disease that – that he had any residuary effects on January 12th of 2010 when the incident occurred. It's completely irrelevant. He is confusing the issues.

The court then asked DART for the relevance of the evidence. DART's counsel responded:

> MR. McKEEVER: Because I believe Mr. Morris had issues with walking, and that's probably what caused him to fall. And I think the jury should be allowed to consider that evidence and decide whether maybe it was because he was dragging his foot and it caught somehow and that's why he fell, something like that.
>
> THE COURT: Okay. And response?
>
> MR. KELLER: And his only witness that he's had testify stated that he was sturdy. And if he wanted to get into this, he should have either got a biomechanics guy, Judge, or he should have got himself a doctor that was going to say that he was still suffering residual effects back in 2010 when the incident occurred.
>
> THE COURT: Well, to the extent that there's a request to present this testimony to the jury, that request is denied.

In addition to the lack of evidence connecting any residual effects of Morris's stroke to his fall on the bus, the record reflects that the trial court's ruling was also based on DART's two violations of a limine order on the subject. In its opening statement, DART referred to the stroke. Morris's counsel immediately objected, and after a conference at the bench, the trial court instructed the jury to disregard the reference. The court explained to the jury that "counsel has violated a rule that I told about discussing certain matters in evidence. So you are to

–16–

disregard any statement about the plaintiff having any stroke. That is not for you to consider in evidence, nor will it be in this case." Later, in its cross-examination of Morris, DART asked a series of questions whether Morris had ever walked with a limp or had problems walking in the past. Morris finally answered that the only time he had problems walking was "right after I had the stroke." Again, Morris's counsel immediately objected to DART's "intentional" violation of the order in limine, and the trial court instructed the jury to "disregard any testimony at this point about the stroke."

Shortly after the conclusion of trial, the court considered Morris's motion for sanctions against DART for violation of the limine order. The trial court noted that DART "might have very well been successful" in its argument that Morris had "opened the door" to evidence of his stroke by testifying that he had not walked with a limp in the past. The court stated, however, that the limine order was in place and should have been obeyed:

> [T]his opening the door argument . . . . might have been a prevailing argument, but that still does not dispense with the necessity of having to approach and say, Well, Judge, we think the door's been opened and here's why, and if I agree, say, Okay, the door's been opened, now you can do it. So do you [DART's counsel] . . . have a comment as to why you thought that despite the belief that the door had been opened, that you didn't have to come up to the Bench and request that? Because, in effect, what [DART's counsel] did was he took it upon himself to make, in effect, an evidentiary ruling that the door had been opened and denied the Court the opportunity to make that ruling.

The trial court took the motion for sanctions under advisement, and the record does not reflect any further ruling; the trial court may have concluded that exclusion of the evidence was sufficient. *See Vela v. Wagner & Brown, Ltd.*, 203 S.W.3d 37, 44 (Tex. App.—San Antonio 2006, no pet.) (opinion on rehearing) (imposition of sanctions for violation of order in limine is left to sound discretion of trial court, and appellate court will not reverse trial court's decision absent clear abuse of discretion).

–17–

We conclude that DART has not established that exclusion of the evidence was error, or that the error probably caused an improper judgment. *See McCraw*, 828 S.W.2d at 757. After reviewing the entire record, we conclude that the trial court's judgment does not turn on the excluded evidence. *See City of Brownsville*, 897 S.W.2d at 753–54; *Cent. Expressway Sign Assocs.,* 302 S.W.3d at 870. As Morris points out, there is no evidence that he was suffering any residual effects from the stroke on the day he fell or in the months preceding it. Medical records from Morris's fall on the bus that were admitted into evidence did include references to a stroke in Morris's medical history, but none of these records indicated that problems resulting from the stroke were a possible cause of the fall. DART points to no specific evidence in the excluded exhibit that would tend to prove otherwise, and its offer of proof did not include any such evidence. The excluded exhibit appears to consist primarily of medical records from 2006. The jury's verdict and the trial court's judgment turn on the parties' negligence, or lack of negligence, in 2010. The jury found both Nelson and Morris to have been negligent, and the trial court rendered judgment in accordance with the verdict. We conclude the trial court did not abuse its discretion by excluding evidence relating to Morris's 2006 stroke. *See Enbridge Pipelines,* 386 S.W.3d at 262. We resolve DART's third issue against it.

## JURY ARGUMENT

In its fourth issue, DART complains that Morris's counsel made improper and incurable jury arguments. DART does not point to a specific reference in the closing argument or provide a quote it contends was improper. DART generally argues that "counsel for Appellee persisted in attacks on Appellant itself, instead of confining the argument to the evidence." DART argues that "these attacks included attempting to appeal to the passion or prejudice of the jury" by (1) urging the jury to send a message to DART; (2) accusing DART of a "cover up," contrary to the "true facts of the case," and (3) asking the jury to punish DART with an award of one million

–18–

dollars in damages. DART complains that the trial court did not intervene, and any objections DART made were overruled.

DART's complaint on appeal is broader than its objections at trial.[7] However, a complaint of incurable jury argument may be asserted and preserved in a motion for new trial even without an objection and ruling at trial. *Nguyen v. Myers*, No. 05-11-01510-CV, 2013 WL 1277838, at *7 (Tex. App.—Dallas Feb. 14, 2013, no pet.). In its motion for new trial, DART made essentially the same complaint it makes now on appeal.

Incurable jury arguments are rare and generally encompass "arguments that strike at the courts' impartiality, equality, and fairness" because they "inflict damage beyond the parties and the individual case under consideration if not corrected." *See Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 681 (Tex. 2008) (per curiam). Instances of incurable jury argument include (1) appeals to racial prejudice, (2) unsupported, extreme, and personal attacks on opposing parties and witnesses, and (3) "accusing the opposing party of manipulating a witness, without evidence of witness tampering." *Id.*; *see also Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 840 (Tex. 1979); *Tex. Emp'rs Ins. Ass'n v. Haywood,* 266 S.W.2d 856, 858 (Tex. 1954)); and *PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 721 (Tex. App.—Dallas 2011, pet. denied).

To prevail on an incurable jury argument complaint, the complaining party on appeal generally must show the argument by its nature, degree, and extent constituted such error that an instruction from the court or retraction of the argument could not remove its effects. *See Living Ctrs. of Tex., Inc.*, 256 S.W.3d at 680–81. This requires a showing based on the entire record

---

[7] DART made two objections at trial. First, DART objected that asking the jury "to be the conscience of the community is improper." Second, DART objected to "improper argument" during Morris's rebuttal argument. The trial court overruled both objections.

that the probability the improper argument caused harm is greater than the probability the verdict was grounded on the proper proceedings and evidence. *See Reese*, 584 S.W.2d at 840.

DART has not shown "the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence." *Reese*, 584 S.W.2d at 840; *Nguyen*, 2013 WL 1277838, at *6–7. There was evidence that the DART driver did not follow DART's safety procedures and that Morris's fall was caused by the driver's failure to wait until Morris had crossed the yellow line or been seated before the bus began to move. There was evidence supporting the amounts awarded by the jury for past medical expenses and past loss of earning capacity. The jury attributed some responsibility to Morris for his injuries. The record reflects that the jury's verdict was "grounded on the proper proceedings and evidence." *Reese*, 584 S.W.2d at 840. The argument DART complains of was not one of those "rare" instances that is so inflammatory as to be incurable. *See Cottman Transmission Sys,. L.L.C. v. FVLR Enters., L.L.C.*, 295 S.W.3d 372, 380 (Tex. App.—Dallas 2009, pet. denied). After a review of the entire record, we conclude DART has not shown that "the argument by its nature, degree and extent constituted reversible harmful error." *Mitchell v. Bank of Am., N.A.*, 156 S.W.3d 622, 629 (Tex. App.—Dallas 2004, pet. denied). We resolve DART's fourth issue against it.

**CONCLUSION**

We overrule DART's four issues. We affirm the trial court's judgment.

/Robert M. Fillmore/
_____
ROBERT M. FILLMORE
JUSTICE

121133F.P05

–20–

# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DALLAS AREA RAPID TRANSIT,
Appellant

No. 05-12-01133-CV      V.

DAVID MORRIS, Appellee

On Appeal from the 193rd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-11-07709.
Opinion delivered by Justice Fillmore,
Justices FitzGerald and Evans participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee David Morris recover his costs of this appeal from appellant Dallas Area Rapid Transit.

Judgment entered this 29th day of May, 2014.

/Robert M. Fillmore/

ROBERT M. FILLMORE
JUSTICE