**Affirmed and Opinion Filed October 14, 2014**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-12-00941-CV

## CLASSIC SUPEROOF LLC, Appellant
## V.
## DONNA K. BEAN, Appellee

**On Appeal from the County Court at Law No. 3**
**Collin County, Texas**
**Trial Court Cause No. 3-1546-2010**

## MEMORANDUM OPINION

Before Justices Bridges, Francis, and Lang-Miers
Opinion by Justice Bridges

This is an appeal from a bench trial in which the trial court found in favor of appellee Donna K. Bean on her contract and DTPA claims against appellant Classic Superoof LLC. Classic raises seven issues on appeal: (1) the evidence is legally and factually insufficient to support the trial court's findings of fact and conclusions of law to support liability under Bean's contract and DTPA causes of action; (2) the trial court abused its discretion by admitting a report over Classic's hearsay objection because the report was made in anticipation of litigation; (3) if the trial court's finding of liability hinged on incomplete flashing work, then the evidence is legally and factually insufficient to support damages; (4) the trial court erred by awarding $29,000 in damages because Bean failed to show the cost to repair the roof was reasonable and necessary; (5) the trial court erred by excluding the testimony of Classic's expert; (6) the trial

court erred by awarding Bean $100,000 in attorneys' fees because she failed to establish damages; and (7) the trial court erred in awarding attorneys' fees because Bean failed to present sufficient evidence to support the award. We affirm the trial court's judgment.

## Background

During the process of building her home, Bean searched the internet for information about metal roofs. Metal Roof Alliance's website provided her with the ability to reach out to metal roof contractors in her area. Stanley Keith Lyles, the president of Classic, received an email with Bean's information and responded via email to her request. He provided basic information about Classic's metal roof services. She also visited Classic's website, at Lyles's suggestion, and looked at previous roofs installed by Classic. She thought the work "was beautiful." Based on language from the website that Classic's products "are more durable, more energy efficient, longer lasting, and more beautiful," she thought "[Classic] would do a very good job."

After Lyles contacted Bean, they talked several times on the phone before setting up a meeting. When he came to her home, they discussed several roofing material options and color choices. She asked about a white roof, and Lyles told her a white roof would show dirt sooner than other types of colors. Lyle also explained a painted finish would cost more than an unpainted finish.

Lyles brought material samples to show Bean. He described galvalume, which is a coating that protects steel from the elements, and she was impressed with its sturdiness. She liked the stainless look but was concerned it might look like barn metal after a period of time,

"and that's why I chose the galvalume plus."[1] She believed that based on their conversation, Lyles understood the look of the roof was important to her.

The parties entered into a $40,000 contract on December 21, 2009 for the installation of a galvalume plus roof. Bean wrote a check for $9,000. She later wrote another check for $20,000.

Roof installation began in early January. Luis Hevert and a crew of six to eight people installed the roof. The roof installation took longer than anticipated because of rain. The rain also caused mud accumulation around the home and despite the crew's best efforts, some mud prints were left on the roof.

After installation, Bean immediately noticed a problem with the roof's appearance. Lyles said it was the nature of a metal roof and "it," which he thought was mud, would wash off. Hevert came out twice in February and March to try and clean the mud, but to no avail.

Lyles later referred to the markings as handling tracks left by handprints or footprints during installation. The appearance of the markings varied depending on lighting conditions. Lyles told Bean these "stains" would become less visible over time, but he also testified, "There is probably a few more" scuff marks than he would normally expect on this type of roof.

Bean did not sign the certificate of completion after installation of the roof and objected immediately to the roof as "unacceptable." Lyles admitted he did not ask her to sign the certificate of completion because he knew there was a problem with the roof. Bean said Lyles offered to replace her roof in March. He repeatedly admitted something was wrong with the roof and said he had seen thousands of roofs but never seen one "do this."

When cleaning did not remove the stains, Lyles told Bean perhaps something was wrong with the acrylic coating. Lyles suspected it might be a manufacturing defect so he contacted

---

[1] Galvalume was described as "very oily" and extremely sensitive to stains when touched or walked on. Acrylume, a plastic coating, was developed to serve as a coating for galvalume to help cut down on some of the abrasions and staining that could occur. Galvalume with an acrylume coating is referred to as galvalume plus.

Sheffield Metal International, the supplier that provided Classic with the material. Sheffield Metal, in turn, contacted U.S. Steel Corporation, the manufacturer of the galvalume plus coating from which the roofing panels were made.

In May of 2010, approximately four months after installation, David Head, a metallurgical engineer with U.S. Steel, went to Bean's home to inspect the roof. Mike Blake from Sheffield Metals was also present. Head took pictures, inspected the roof from a ladder, and requested samples from areas that were "representative of the concern that we observed."

During Head's visual inspection, he observed what appeared to be scuffs or scratches in random locations across the roof, specifically near seam edges and the "roof cap." The scuffs and scratches became more apparent as lighting conditions changed. His initial impression of the roof was that it did not look the way it should and further evaluation through sampling was necessary. He estimated that seventy-five percent of the roof's panels were effected. Head testified handprints and footprints are different from scuffs on a roof's surface. A handprint or footprint on bare galvalume that has been "oiled" results in a stain on the roof's surface, whereas a scuff is a mechanical deformation of the surface.

After testing the samples, U.S. Steel produced a report stating the galvalume coating was mechanically deformed and damaged in the scuff mark areas. However, the testing revealed the damage had not penetrated through the galvalume to the steel substrate, which would result in almost immediate rusting. Despite the absence of rust, Head did not believe the damage was purely cosmetic. Rather, he believed "there is a possibility that the long-term service life of this galvalume was minimized or potentially minimized by the damage that had occurred." Simply because rust had not occurred yet, did not mean the roof was not damaged.

Head admitted his primary purpose of evaluating the roof was to determine whether a problem existed with U.S. Steel's product (he concluded there was no manufacturing defect), but

that was not his only purpose. His goal was to determine the problem, if any, and find a solution. His ultimate opinion was that the galvalume coating on the roof was damaged during installation, the damage was beyond cosmetic, and if rust appeared in the damaged areas, US Steel would void its warranty.

Bean sent Classic a demand letter on May 21, 2010. She gave Classic until May 31, 2010 to respond. After receiving Bean's demand letter, Lyles offered to remove and replace those portions of the roof that Bean thought were stained. He also offered to pay her $1,000 for attorneys' fees and expenses. Bean rejected the offer. He then offered to walk away and forgive the $11,000 she owed under the contract, but she also rejected this offer. She sued on June 11, 2010 for breach of contract and various DTPA violations.

During trial, Bean testified Classic maintained the problematic appearance of the roof was a manufacturing defect "quite a long time . . . up until the time that they decided to say there is just nothing wrong with the roof at all, no damage." She did not feel the contract was honored because Classic did not deliver what they promised. While she acknowledged Classic provided a "good sturdy roof," she argued "it's not more beautiful" or what the parties agreed to in the contract.

At the conclusion of the bench trial, the trial court awarded $29,000 in damages for breach of contract and DTPA violations and $100,000 in attorneys' fees. The trial court entered findings of facts and conclusions of law. Classic timely appealed the final judgment.

## Breach of Contract

In its first issue, Classic argues the evidence is legally and factually insufficient to support the trial court's conclusion that it breached its contract with Bean based on the aesthetic appearance of the roof or because the roof was damaged. Bean argues the aesthetic appearance

of the roof was an implied material term of the contract and even if it was not, the evidence supports the trial court's conclusion the roof was damaged.

Findings of fact in a nonjury trial have the same force and dignity as a jury's verdict and may be reviewed for legal and factual sufficiency under the same standards. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). In evaluating the legal sufficiency of the evidence to support an adverse finding on an issue the challenging party did not have the burden of proof, we must credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *Shaw v. Cnty. of Dallas*, 251 S.W.3d 165, 169 (Tex. App.—Dallas 2008, pet. denied). A legal sufficiency challenge will be sustained when (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). Anything more than a scintilla of evidence is legally sufficient to support a challenged finding. *Shaw*, 251 S.W.3d at 169

When a party is attacking the factual sufficiency of an adverse finding on an issue for which it did not have the burden of proof, the attacking party must demonstrate that there is insufficient evidence to support the adverse finding. *Dallas Cnty. v. Holmes*, 62 S.W.3d 326, 329 (Tex. App.—Dallas 2001, no pet.). In reviewing a factual sufficiency issue, we consider all the evidence supporting and contradicting the finding. *Id.* We will set aside a finding for lack of factual sufficiency only if it is so contrary to the overwhelming weight of the evidence to be clearly wrong and unjust. *Shaw*, 251 S.W.3d at 169. We review a trial court's legal conclusions de novo. *Id.* We evaluate those conclusions independently to determine whether the trial court correctly drew the conclusion from the fact. *Id.*

Additionally, in a nonjury trial, the trial court is the sole judge of the credibility of the witnesses and the testimony's weight. *Id.* The trial court may believe one witness and disbelieve others and may resolve inconsistencies in a witness's testimony. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986).

The elements of a contract are an offer, an acceptance, a meeting of the minds, each party's consent to the terms, and an execution and delivery of the contract with the intent it be mutual and binding. *Plotkin v. Joekel*, 304 S.W.3d 455, 476 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Classic argues if Bean's breach of contract claim was based upon the installation of a defective roofing system, then Bean failed to produce more than a scintilla of evidence because any future roof damage was nothing more than a "theoretical possibility." Classic focuses primarily on testimony from Head, the metallurgical engineer with U.S. Steel.

When Head visually examined the roof, he estimated seventy-five percent of the panels were effected by markings, and he considered this "significant damage in most of the roof area." The tested roof samples revealed that the scuff marks were caused by mechanical abrasions "possibly introduced during the roll forming or the installation process." Nothing in the report stated that the mechanical abrasions would not affect the performance of the roof panels. He further stated cross sections of a sample showed the galvalume coating was mechanically deformed and damaged in the scuff mark area. In his expert opinion, the damage to Bean's roof was not purely cosmetic.

While Classic argues any damage to the roof is speculative because the evidence shows the roof had not started to rust, Head specifically testified the absence of rust did not mean the roof was not damaged. Further, he explained the propensity for the damaged areas to wear down quicker was greater than those areas undamaged. There was a significant difference between the galvalume coating in the normal area and the galvalume coating in the scuffed area. He could

not preclude the possibility that the damage to the galvalume coating could extend to the steel substrate and cause rust. If rust occurred in those areas, the warranty provided by U.S. Steel would be voided.

While we agree with Classic that uncertainty as to the fact of damages is fatal to recovery in a breach of contract claim, as detailed above, we do not agree the evidence presented at trial is uncertain or purely conjectural. *See, e.g., McKnight v. Hill & Hill Exterminators, Inc.*, 689 S.W.2d 206, 207 (Tex. 1985) (noting uncertainty as to the fact of legal damages is fatal to recovery in a breach of contract claim). Classic focuses only on the fact the roof had not started to rust. However, just because the roof had not yet become damaged enough to void U.S. Steel's warranty does not negate the fact Head testified, based on the report produced after testing the roof panels, that Bean's roof was in fact damaged. Further, Head made it clear it was more likely the damaged areas would wear down quicker, causing more damage. As Bean argued, "The fact that the roof has not yet rusted does not alter the fact that the Plaintiff did not receive the roof the Defendant contracted to provide."

Accordingly, we conclude more than a scintilla of evidence exists to support the trial court's finding the roof was damaged and to support its conclusion that the "roof as installed did not comply with what the Plaintiff contracted to receive and the roof as installed by Classic Superoof was in breach of the contract between itself and Ms. Bean." We further conclude the evidence supporting the trial court's findings and conclusions are not so contrary to the overwhelming weight of the evidence to be clearly wrong and unjust. Having concluded the evidence supports the breach of contract claim because the roof was damaged, we need not address Classic's argument that the trial court erred by concluding it breached an implied aesthetics clause that was not a part of the contract. Classic's first issue is overruled.

Having determined the trial court's finding of liability was based on Classic's breach of contract, we need not consider Classic's third issue in which it alternatively argues the evidence is legally and factually insufficient to support a finding of liability based on incomplete flashing work. TEX. R. APP. P. 47.1. Moreover, the trial court did not make any findings or conclusions regarding flashing work. Thus, Classic's third issue is overruled.

**Admission of U.S. Steel Report**

In its second issue, Classic argues the trial court abused its discretion by admitting U.S. Steel's report because it was made in anticipation of litigation. Bean responds Classic failed to object; therefore, the issue is waived. Alternatively, Bean contends the report was not made in anticipation of litigation, but rather falls within the exception to the hearsay rule involving records of regularly conducted business activity.

Bean's assertion that the record is "void of any objection" is incorrect. While Classic did not specifically use the phrase "created in anticipation of litigation" when objecting to the admission of the report, it did argue the report was based on bias and lacked trustworthiness, which violated Texas Rule of Evidence 803(6). *See* TEX. R. EVID. 803(6) (hearsay exception for records conducted in regular course of business). Classic further argued the U.S. Steel employees who conducted the tests on the roof samples and wrote the report "had every reason to conduct their tests in such a way as to exonerate U.S. Steel Corporation and implicate another. . . ." Thus, Classic's argument was specific enough to enable the trial court to understand the precise nature of the error alleged and was presented at such a time as to enable the trial court the opportunity to cure the alleged error. TEX. R. APP. P. 33.1; *Lake v. Premier Transp*., 246 S.W.3d 167, 174 (Tex. App.—Tyler 2007, no pet.). As such, Classic preserved its complaint for review. We shall now address the merits of Classic's argument to determine if the trial court abused its discretion by admitting the report. *See Dallas Area Rapid Transit v. Morris*, 434 S.W.3d 752,

763 (Tex. App.—Dallas 2014, pet. filed) (admission of evidence reviewed under an abuse of discretion standard).

Rule 803(6) permits admission of hearsay that is a record of a regularly conducted business activity. TEX. R. EVID. 803(6). A proper predicate for admission under this rule requires "a showing that the document was made in the regular course of business, at or near the time of the acts or conditions sought to be shown, by employees or agents customarily making such records or customarily transmitting information to be placed in the records and who had personal knowledge of the acts or conditions recorded." *Thirteen Thousand Six Hundred Five Dollars in U.S. Currency v. State*, No. 05-98-00072-CV, 2000 WL 567053, at *4 (Tex. App.—Dallas May 4, 2000, no pet.) (not designated for publication). The rule, however, does not apply if a record was prepared in anticipation of litigation. *See Ortega v. Cach, LLC*, 396 S.W.3d 622, 630–31 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

Classic argues U.S. Steel removed panels from Bean's roof for testing only after it knew Bean was unhappy and after Classic had contacted Sheffield Metals and inquired whether Classic might have to make a claim against U.S. Steel's insurance company. Based on the events leading up to the creation of the report, Classic asserts U.S. Steel knew or should have known the controversy "might blow up into a lawsuit."

The record is clear Bean did not request or hire anyone from U.S. Steel to take samples from her roof, test them, and then create a report. According to Head, someone from Sheffield Metals contacted him. Head described his job responsibilities as providing technical service to customers in the field in the use and manufacture of the steel they purchase, calling on customers in various markets for building applications, and helping customers investigate any problems with the material or with the process in utilizing the purchased material.

He explained that when he visits a site, he tries not to prejudge but rather gathers information, makes observations, and makes determinations independently on case conditions. His objective is to determine if a problem exists with the steel that was supplied and what steps may be taken to resolve a complaint. When asked if it was his goal to exonerate any party, he answered, "No, it was not. It was to investigate the cause of the concern." His objective was to be straight forward and honest in his investigation to serve the customers, the installers, and U.S. Steel.

While Classic surmises that U.S. Steel was a stakeholder in the litigation and "incentivized to make self-serving statements in the report," at the time Head visited Bean's home in May of 2010, there was no lawsuit on file. All Head knew was that Bean was upset with the installation of her roof, and he testified that his goal was to determine the cause and find a solution.

Based on the record before us, we conclude the trial court did not abuse its discretion by admitting the report into evidence as an exception to the hearsay rule because it was not made in anticipation of litigation. Accordingly, we overrule Classic's second issue.

## Damages

In its fourth issue, Classic argues the trial court erred by awarding $29,000 in remedial damages because Bean failed to show the cost to repair the roof was reasonable and necessary. Bean responds the trial court properly awarded her actual damages under the contract. We agree with Bean.

The universal rule for measuring damages for a breach of a contract is just compensation for the loss or damage actually sustained. *Qaddura v. Indo-Eurpoean Foods, Inc.*, 141 S.W.3d 882, 888 (Tex. App.—Dallas 2004, pet. denied). Thus, the goal is to restore the non-breaching

–11–

party to the same economic position in which it would have been had the contract not been breached. *Id*.

We first note Classic's contention that Bean recovered damages on a theory different than that prayed for in her last live pleading is without merit. While we agree Bean's last live pleading requested "the cost of replacing Plaintiff's roof," she also requested "actual damages for breach of contract in the amount of $29,000."

Next, Classic challenges the damage award under the theory of what a party must prove to recover remedial damages under a construction contract.[2] It argues Bean failed to present any evidence showing the reasonable and necessary cost to repair or replace her roof. We agree that in order to recover remedial damages for a breach of contract, a party must present evidence to support the reasonableness of the remedial damages. *See McGinty v. Hennen*, 372 S.W.3d 625, 627 (Tex. 2012). We likewise agree Bean did not present any such evidence. Accordingly, we conclude the trial court did not base its award on remedial damages; therefore, we must determine if the evidence is sufficient to support the trial court's actual damages award.

The record is clear the parties entered into a contract in which Bean agreed to pay $40,000 to Classic for the installation of a roof. Bean paid $29,000 towards the roof; however, she refused to pay the remaining amount because she was unhappy with the appearance of the roof and the roof was damaged. Having previously concluded Classic breached the contract, Bean was entitled to her actual damages in the amount of $29,000, which was the amount that would return her to the same economic position in which she would have been had Classic not breached the contract. *See Qaddura v*, 141 S.W.3d at 888 (discussing compensation for the loss

---

[2] In its reply brief, it raises new arguments regarding reliance damages; however, we will not consider arguments raised for the first time in a reply brief. *Brown*, 326 S.W.3d at 654 n.2.

actually sustained, which includes restoring the non-breaching party to the same economic position in which it would have been had the contract not been breached).

In reaching this conclusion, we are mindful of the two measures of damages generally used for recovery in breach of construction contract cases: remedial damages and difference-in-value damages. *See McGinty*, 372 S.W.3d at 627. Nevertheless, the proper measure of damages must also be determined by the facts of each individual case. *See, e.g., Westminster Falcon/Trinity L.L.P. v. Shin*, No. 07-11-0033-CV, 2012 WL 5231851, at *2 n.3 (Tex. App.— Amarillo Oct. 23, 2012, no pet.) (mem. op.) (concluding remedial and difference-in-value damage theories did not apply in construction law case when party tried case under a benefit of the bargain damage theory). Bean "was willing to accept returning to the economic position she was in prior to the Defendant's conduct, which was realized with an award of the sums she paid for the roof." Thus, under the facts of this case, we conclude the evidence is sufficient to support the trial court's actual damage award of $29,000. Classic's fourth issue is overruled.[3]

## Exclusion of Expert Testimony

In its fifth issue, Classic asserts the trial court abused its discretion by excluding Bill Williams, an expert on residential real estate sales. Bean responds the trial court properly excluded Williams because his testimony was irrelevant. We agree with Bean.

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702. We review the trial court's decision to admit or exclude expert testimony for an abuse of discretion. *Wyndham Int'l, Inc. v. Ace Am. Ins. Co.*, 186

---

[3] Having concluded Bean established her breach of contract claim under issue one and her contract claim was supported by sufficient evidence of damages under issue four, we need not address Classic's arguments regarding whether the evidence is sufficient to support the trial court's findings and conclusions regarding DTPA violations. TEX. R. APP. P. 47.1.

–13–

S.W.3d 682, 685 (Tex. App.—Dallas 2006, no pet.). A trial court abuses its discretion when its decision is arbitrary or unreasonable, or it acts without reference to any guiding rules or principles. *Id.*

Here, Classic argued the testimony of Williams was relevant because he could provide evidence regarding the diminution in value of Bean's home resulting from the alleged defective roof. However, as Bean correctly argued, diminution in value of her home was not a proper measure of calculating damages under these facts. Bean's damages arose from the failure of Classic to install the roof agreed upon; not any devaluation of her property based on the roof. Thus, any testimony he might have provided would not have assisted the trier of fact to understand or determine any appropriate measure of damages. Because Williams's testimony was not relevant, the trial court did not abuse its discretion by excluding him as an expert. *See Fleming v. Kinney*, 395 S.W.3d 917, 926 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (stating an expert's opinions must be relevant to the issues in the case and based upon a reliable foundation to be admissible under rule 702). We overrule Classic's fifth issue.

### Attorneys' Fees

In issues six and seven, Classic challenges the trial court's award of $100,000 in attorneys' fees because Bean failed to establish her damages and failed to present sufficient evidence to support the award. Bean responds she proved contract damages, which entitled her to recovery of her attorneys' fees, and the award was supported by sufficient evidence.

A trial court's decision to award attorneys' fees is reviewed for an abuse of discretion, and the amount awarded is reviewed under a legal sufficiency standard. *Aaron Rents, Inc. v. Travis Cent. Appraisal Dist.*, 212 S.W.3d 665, 671 (Tex. App.—Austin 2006, no pet.).

To recover attorneys' fees under section 38.001 of the Texas Civil Practice and Remedies Code, a plaintiff must (1) prevail on a cause of action for which attorneys' fees are recoverable

and (2) recover damages. *Woodhaven Partners, Ltd. v. Shamoun & Norman, L.L.P.*, 422 S.W.3d 821, 846 (Tex. App.—Dallas 2014, no pet.). Section 38.001(8) allows recovery of attorneys' fees from an individual or corporation if the plaintiff prevails on a claim for breach of contract. TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West 2008); *Woodhaven Partners, Ltd.*, 422 S.W.3d at 846.

We have previously determined the evidence supports Bean's breach of contact claim against Classic and the trial court's damage award. Accordingly, the trial court did not err in awarding attorneys' fees. Classic's sixth issue is overruled.

We now consider whether Bean presented sufficient evidence to support the $100,000 award. Texas law does not require detailed billing or other documentary evidence as a prerequisite to awarding attorneys' fees. *Woodhaven Partners, Ltd.*, 422 S.W.3d at 846. "It has consistently been held that an attorney's testimony about his experience, the total amount of fees, and the reasonableness of the fees charged is sufficient to support an award." *In re A.B.P.*, 291 S.W.3d 91, 99 (Tex. App.—Dallas 2009, pet. denied).

Bean's attorney testified to his experience, the number of hours he spent on the case, and his $300 an hour fee. He explained his fee was reasonable based on his years of experience, and his rate was reasonable compared to other attorneys in Collin County. This testimony was sufficient to support the attorneys' fee award. Thus, the trial court did not abuse its discretion by awarding $100,000 in attorneys' fees.

In reaching this conclusion, we are unpersuaded by Classic's argument that Bean was required to segregate the amount of fees incurred in prosecuting her claims against Classic and those incurred in defending against Classic's claims. A recognized exception to the duty to segregate arises when the causes of action involved in the suit are dependent upon the same set

of facts or circumstances and are intertwined to the point of being inseparable. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 312 (Tex. 2006).

During cross-examination, Bean's counsel testified the defense of the case "melded into the prosecution of it." Moreover, when Classic's attorney testified in support of recovering his own fees for defending against Bean's case and prosecuting Classic's counterclaims, he stated, "Those two matters are inextricably intertwined, and that any service that might have been provided in connection with one also related to the other." Thus, both parties acknowledged that prosecuting and defending their claims involved the same facts and were intertwined. Classic's seventh issue is overruled.

## Conclusion

Having overruled all of Classic's arguments, we affirm the trial court's judgment.

120941F.P05

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

CLASSIC SUPEROOF LLC, Appellant

No. 05-12-00941-CV  V.

DONNA K. BEAN, Appellee

On Appeal from the County Court at Law No. 3, Collin County, Texas
Trial Court Cause No. 3-1546-2010.
Opinion delivered by Justice Bridges.
Justices Francis and Lang-Miers participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee Donna K. Bean recover her costs of this appeal from appellant CLASSIC SUPEROOF LLC .

Judgment entered October 14, 2014