

# NUMBER 13-22-00029-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

FRANK AHLGREN III AND
THE COPERNICAN, LLC,                                        **Appellants,**

**v.**

FRANK AHLGREN JR. AND
ELISE LEAKE, AS CO-TRUSTEES
OF THE AHLGREN MANAGEMENT
TRUST,                                                      **Appellees.**

### On appeal from the 261st District Court
### of Travis County, Texas.

# MEMORANDUM OPINION

**Before Justices Benavides, Tijerina, and Peña**
**Memorandum Opinion by Justice Peña**

Appellants Frank Ahlgren III (Paco) and the Copernican, LLC (the Copernican)

appeal a judgment in favor of appellees Frank Ahlgren Jr. (Nim) and Elisa Leake

(Leesie),[1] in their capacities as co-trustees of the Ahlgren Management Trust (AMT collectively). AMT sued appellants alleging that they refused to return property held in trust for Nim's benefit. Following a jury trial, AMT prevailed on its claims for breach of trust, breach of informal fiduciary duty, and unjust enrichment. The trial court entered a judgment awarding AMT $29,329,378 in profit disgorgement and a constructive trust in various assets, including significant cryptocurrency holdings.

In nine issues, which we reorder and reframe as five issues, appellants argue: there is legally and factually insufficient evidence of (1) each claim and remedy; the trial court erred in (2) granting summary judgment on appellants' affirmative defenses, (3) rejecting appellants' proposed jury instructions, and (4) awarding a permanent injunction; and (5) AMT's improper jury argument warrants a new trial. We affirm.[2]

## I. BACKGROUND

AMT sued appellants, alleging that Paco and his company the Copernican "absconded" with assets that were held in trust for the benefit of Paco's father, Nim. AMT claimed that Paco commingled trust assets with his own and that Paco "accumulated substantial wealth, mainly through purchases of cryptocurrency[3] made possible by Nim's contributions . . . ." AMT alleged that Paco breached his fiduciary duty when he refused Nim's request to return his share of the assets in October 2019. After the parties

---

[1] To distinguish between the Ahlgren parties we will refer to each by their preferred names as set out in the parties' briefs. Elisa Leake, or Leesie, is Nim's daughter.

[2] This case is before this Court on transfer from the Third Court of Appeals in Austin pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001.

[3] "A cryptocurrency, crypto-currency, or crypto is a digital currency designed to work as a medium of exchange through a computer network that is not reliant on any central authority, such as a government or bank, to uphold or maintain it." *Cryptocurrency*, WIKIPEDIA, https://en.wikipedia.org/wiki/Cryptocurrency (last visited May 12, 2023).

conducted discovery, AMT filed a no-evidence summary judgment motion seeking to dismiss appellants' affirmative defenses of limitations and the statute of frauds, which the trial court granted. The case then proceeded to trial, at which the following evidence was adduced.

## A.     1997 Agreement

In 1997, a recently retired Nim entrusted Paco to manage his wealth. According to Nim, Paco visited his home and "began asking me, practically begging me, to let him become my money manager." Paco said he would "work for Nim's benefit" and that Nim could end the arrangement at any time and have his assets returned. Paco agreed he would keep Nim's holdings separate from his own. To facilitate Paco's management of the funds, Nim granted Paco full power of attorney. Nim claimed that he gave Paco "total power to manage my assets."

The two initially agreed that Paco would manage and invest Nim's holdings in his account at First Tennessee Bank—a $1.3 million inheritance from Nim's father. Paco confirmed to others that he was managing Nim's assets for Nim's benefit. In 2000, Paco emailed Leesie, Nim's daughter and Paco's sister, stating he had total control of Nim's money. Paco later claimed by email, "I'm going to continue to legally transfer as much of Nim's estate as I can into my own name" and that "any money I move into my name from Nim's accounts I intend to keep in my name until he needs me to help him out." In another email to Leesie, he stated, "I've been managing [Nim's] money for four years." Paco confirmed in an unrelated deposition that he started managing Nim's money in 1997.

## B.     Paco's Investments of Nim's Assets

In late 1997 or early 1998, Paco transferred $100,000 of Nim's holdings to a hedge

3

fund managed by Paco, called the Popperian. Soon after, he transferred the remainder of Nim's First Tennessee assets to a Charles Schwab brokerage account (Schwab account), over which Paco held full power of attorney. The Schwab and Popperian account were in Nim's name, however, Nim stated he did not have the password to access them, and they were controlled exclusively by Paco.[4] Nim testified that Paco made all the transfers and asset allocations associated with the Schwab account. Nim described having to sometimes sign documents at Paco's request. Nim lived off his pension and social security payments, for which he maintained a separate checking account.

In 1998, Paco asked Nim to make one-time gifts of $325,000 each to Paco and Leesie, the maximum allowed under the federal gift tax exemption at the time. Nim agreed, and Paco transferred the funds from the Schwab account to himself and Leesie. Paco often communicated by email with Leesie and her husband Carter regarding his management of Nim's holdings. Much of the conversations concerned Paco's suggestions that Nim gift further money to minimize the federal estate tax when Nim passed. Paco made several annual $10,000 transfers from Nim's account to himself, Leesie, and Leesie's children to maximize the gift tax exemption. Nim testified that he was unaware of these additional payments. After Leesie questioned Paco about transfers between Nim's Schwab account and Paco's own accounts, Paco changed the password so Leesie no longer had access.

In December 1998, Paco emailed Leesie and Carter that he transferred some of Nim's stock holdings into the Popperian. In 1999, Paco emailed that he "took care of Nim's account" by selling certain securities. Later that year, Paco emailed that Nim's estate was

---

[4] Nim testified that he had access to a separate Schwab checking account that Paco would fund.

worth roughly $1 million. In January 2000, Paco stated in an email that he transferred approximately $300,000 from Nim's Merrill Lynch brokerage account—which constituted a separate inheritance from Nim's mother—to Nim's Schwab account.

Paco emailed in June 2000, that Nim's "total net worth exceeds (easily) $1 million." Paco sent an email a few days later that was more specific regarding Nim's holdings— $687,560.91 in the Schwab account and $192,019.63 in the Popperian fund. In February 2001, Paco updated the totals—$619,500.14 and $187,629.98, respectively. In October of that year Paco emailed that due to a market decline, the account balances had fallen to $460,150.81 and $163,079.33. In December 2001, Paco emailed another update of the approximate account balances—$440,000 and $189,000. At the end of 2001, Paco liquidated Nim's interest in the Popperian fund. Nim testified that Paco said he was investing the proceeds from the account in real estate.

In a March 2004 email to Leesie, Paco stated that Nim's holdings were approximately $320,000, that his condo and automobile were paid for, and that Nim received $1,200 per month from his pension and social security payments. By 2006, Nim lived with Paco permanently. At that time, Paco told Nim he was going to liquidate Nim's Schwab account and invest the money in real estate. On April 24, 2006, Paco transferred the remaining assets into his own brokerage account, which he later liquidated to cash. In Paco's 2006 federal income tax return, he reported acquiring several securities on April 24, 2006, and selling most of them the next day, with the remainder being sold within a month. Paco reported receiving $316,637 from the sale of those securities.[5] On May 1,

---

[5] Paco also reported selling certain stocks on April 18, 2006, for $3,951, bringing the total reported gains to $320,588.

5

2006, Paco purchased a commercial property located at 4410 Burnet Road in Austin, Texas. Paco titled this property in his name. Later that year, Paco acquired two other Austin properties—4619 Rosedale Avenue and 5513 Jeff Davis Avenue. To close on all three properties, Paco paid approximately $300,000. Pamela Clegg, AMT's expert witness in cryptocurrency and asset tracing, testified that Paco's only available assets to close on those transactions were the funds Paco received from the liquidation of the Schwab account.

In October 2006, Paco assisted Nim in refinancing his paid-off condominium in El Paso. Ultimately, the refinance netted $67,926.88. Nim stated that Paco received the proceeds to invest for Nim's benefit.

In a September 2007 email, Paco asked his accountant various questions regarding transferring Nim's condominium to himself or the Copernican. Paco later assisted Nim in selling the condo.[6] Nim maintained he did not receive the proceeds.

In August 2008, Paco used proceeds from a cash-out refinancing[7] of two of the Austin properties to purchase an additional property at 4602 Rosedale. Paco told Nim that Nim was invested in the property. From 2005 to 2008, Paco had no significant source of income other than rent from the properties, and the proceeds from cash-out refinancing.[8] Nim provided Paco with an additional $208,000 to help pay the mortgages on the real estate holdings. These funds came from his social security, pension, life

---

[6] The record does not reflect the amount received from the sale.

[7] The record reflects that a cash-out refinance is a mortgage refinancing option that allows a borrower to convert home equity into cash.

[8] Paco offered testimony to the contrary. Yet, he reported no substantial income on his federal income tax returns for these years. We presume the jury resolved this conflict in favor of its verdict. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005).

6

insurance policy, and the refinancing of his condominium.

During the housing market crash in 2008, Paco and Nim lost several properties to foreclosure. However, Paco continued to hold legal title to 4410 Burnet and 4602 Rosedale, where both Paco and Nim resided. Paco confirmed in an unrelated deposition that Nim's money went toward real estate investments from 2005 to 2008. In 2015, Paco told Nim that "[w]e were investing in cryptocurrency." Paco then sold 4410 Burnet, netting $685,457.49 in cash. Paco deposited this sum into his own account.

## C.  Tracing Bitcoin

Clegg explained that cryptocurrency is a form of virtual currency that runs on blockchain and utilizes cryptography for security. Clegg described a blockchain as a database that validates cryptocurrency transactions. The blockchain contains a ledger of all cryptocurrency transactions and the digital addresses of the particular cryptocurrency involved. She stated that Bitcoin is the predominant cryptocurrency in existence. The blockchain for Bitcoin is a publicly available database that records every Bitcoin transaction. Clegg explained that each Bitcoin transaction has a unique identifier. The owner of Bitcoin uses a private key to access holdings at a particular address on the blockchain.

Using records from a cryptocurrency exchange, Clegg identified Paco's Bitcoin acquisitions. According to Clegg, Paco purchased 1,280.31 Bitcoin for approximately $315,000 in the eleven weeks following the sale of 4410 Burnet. Paco transferred the remaining proceeds to an account held by the Copernican. Paco testified that he used proceeds from the sale of Bitcoin to purchase hundreds of ounces of gold. In 2017, Bitcoin greatly appreciated in value. At this time, Nim recalled Paco telling him, "[w]e have money

again." According to Clegg, Paco received new cryptocurrency coins for each Bitcoin he held due to "hard forks" in 2017. She described a hard fork as the creation of a new blockchain with its own cryptocurrency. Paco liquidated 2,798.21 of the new cryptocurrency Bitcoin Cash into 310.12 Bitcoin. Paco liquidated 2,299 of the new cryptocurrency Bitcoin Gold into 107.31 Bitcoin. According to Clegg, these transactions showed that Paco held at least 2,798 Bitcoin on August 1, 2017, directly traceable to the proceeds from the sale of 4410 Burnet.

Clegg testified that Paco used Bitcoin sale proceeds to purchase a house in Park City, Utah for $3.7 million on October 27, 2017. Paco liquidated 640.365 Bitcoin to facilitate the purchase. Clegg testified that Paco held at least 2,299 Bitcoin after doing so. In February 2018, Paco started "washing" his Bitcoin, meaning he took action to make them untraceable to their original source. Using a CoinJoin mixer, Paco was able to mix his Bitcoin with other users' holdings which resulted in Paco receiving a Bitcoin with a different address on the blockchain. This impeded Clegg's ability to identify the exact amount of Bitcoin that Paco held in 2018. However, Paco himself claimed to own $16,800,000 in Bitcoin by the end of 2018, which according to the market price at the time would constitute 4,553 Bitcoin. Additionally, Jennifer Williams, Paco's ex-wife, testified that Paco "had a couple thousand" Bitcoin in June 2019. According to Clegg, Paco used CoinJoin again in 2020 to "wash" his Bitcoin holdings.

D.    **Nim's Demand for Return of Assets**

In 2019, an eighty-five-year-old Nim lived alone at 4602 Rosedale, while Paco resided in the Park City home. Concerned for Nim's health, Leesie invited him to live near her. On October 15, 2019, Nim asked Paco to return the assets that he believed Paco

was managing for Nim so that he could continue to support himself. At that time, Paco informed Nim that he did not owe him anything. Nim testified that prior to this date, Paco never told Nim that he was no longer managing his assets for Nim's benefit. Nim later moved to live closer to Leesie.

## E.    Jury Verdict and Final Judgment

The jury found in favor of AMT on its breach of trust, breach of informal fiduciary duty, and unjust enrichment claims. The jury found that Paco used Nim's assets to acquire the following: (1) Bitcoin; (2) the Park City property; (3) 4602 Rosedale; and (4) gold. The jury found that Paco obtained fifty percent of the foregoing assets with his own funds. It found that the value of Nim's share of the assets at the time of Paco's breach was as follows: (1) $9,074,390 in Bitcoin; (2) $1,900,000 for the Park City property; and (3) $375,000 for 4602 Rosedale. The jury was not asked to value Nim's interest in gold. Finally, the jury found that Paco earned a $29,329,378 profit resulting from his breach. The jury also found that the Copernican was an alter ego of Paco.

AMT filed a motion for entry of judgment, electing to recover on its breach of trust claim. AMT requested profit disgorgement in the amount of $29,329,378 as well as a constructive trust awarding a fifty percent interest in the aforementioned assets. AMT further requested a permanent injunction to prevent the dissipation of assets that would be subject to the constructive trust.

The trial court signed a final judgment awarding $29,329,378 in damages and a constructive trust over the following property: (1) 1,079 Bitcoin (fifty percent of the 2,158 Bitcoin the jury determined to be held by Paco); (2) a fifty percent interest in the Park City property; (3) a fifty percent interest in 4602 Rosedale; and (4) a fifty percent interest in

9

gold held by Paco. The final judgment contains a detailed calculation of the jury's finding that Paco profited $29,329,378 from his breach. It explains that the amount is based on the appreciation in Bitcoin from the time of Paco's breach to the date of trial. In particular, the value of a single Bitcoin increased by $27,182 during this period. As explained in the judgment, the jury's profit calculation represents this appreciation multiplied by 1,079— the number of Bitcoin that the jury determined belonged to Nim. The final judgment also awards a permanent injunction restraining appellants from "selling, transferring, or encumbering" the constructive trust assets. This appeal followed.

## II.    SUFFICIENCY OF THE EVIDENCE

By their first issue, appellants argue there is legally and factually insufficient evidence supporting each of AMT's claims and remedies.

## A.    Standard of Review

Evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Evidence is legally insufficient to support a disputed fact finding when (1) evidence of a vital fact is absent, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Id*. at 810.

The jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Id.* at 819. Jurors are free to credit one witness's testimony and disbelieve another's, and appellate courts cannot overturn a jury's verdict merely because we might reach a different result. *Id.* Therefore, to give proper deference to the jury's role

10

as factfinder, we assume that the jury resolved all conflicts of credibility in favor of its verdict, crediting favorable evidence if a reasonable juror could, and disregarding contrary evidence if a reasonable juror could have disbelieved it. *Id.*

"When reviewing the factual sufficiency of the evidence, we examine the entire record, considering all the evidence both in favor of and contrary to the challenged finding." *Vast Constr., LLC v. CTC Contractors, LLC*, 526 S.W.3d 709, 723 (Tex. App.—Houston [14th Dist.] 2017, no pet.). When a party attacks the factual sufficiency of the evidence pertaining to a finding on which the party did not have the burden of proof, we may set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Bennett v. Comm'n for Law. Discipline*, 489 S.W.3d 58, 66 (Tex. App.—Houston [14th Dist.] 2016, no pet.).

## B.    Oral Express Trust

Appellants argue that there is legally and factually insufficient evidence of an express trust because: (1) Nim did not manifest an intent to create a trust; (2) Nim did not transfer assets into Paco's name as trustee; (3) assuming a trust was created, it terminated when Paco deposited assets into Nim's own Schwab account; (4) the disputed assets were not trust assets; and (5) an oral trust in real property is barred by the statute of frauds.

### 1.    Applicable Law

The Texas Trust Code provides that "[a] trust may be created by . . . a property owner's inter vivos transfer of the property to another person as trustee for the transferor or a third person[.]" TEX. PROP. CODE ANN. § 112.001(2). "A trust in either real or personal property is enforceable only if there is written evidence of the trust's terms bearing the

11

signature of the settlor or the settlor's authorized agent." *Id*. § 112.004. However, an oral trust in personal property "is enforceable if created by . . . a transfer of the trust property to a trustee who is neither settlor nor beneficiary if the transferor expresses simultaneously with or prior to the transfer the intention to create a trust." *Id.* § 112.004(1); *see Ayers v. Mitchell*, 167 S.W.3d 924, 928 (Tex. App.—Texarkana 2005, no pet.).

"A trust is created only if the settlor manifests an intention to create a trust." TEX. PROP. CODE ANN. § 112.002. Although "[t]echnical words of expression" are not essential, the beneficiary, the res, and the trust purpose must be identified. *Perfect Union Lodge No. 10, A.F. & A.M., of San Antonio v. Interfirst Bank of San Antonio, N.A.*, 748 S.W.2d 218, 220 (Tex. 1988); *ETC Tex. Pipeline, Ltd. v. Addison Expl. & Dev., LLC*, 582 S.W.3d 823, 840 (Tex. App.—Eastland 2019, pet. denied); *Pickelner v. Adler*, 229 S.W.3d 516, 526 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).

"[W]hen a valid trust is created, the beneficiaries become the owners of the equitable or beneficial title to the trust property and are considered the real owners." *Bradley v. Shaffer*, 535 S.W.3d 242, 248 (Tex. App.—Eastland 2017, no pet.) (quoting *City of Mesquite v. Malouf*, 553 S.W.2d 639, 644 (Tex. App.—Texarkana 1977, writ ref'd n.r.e.)). "[I]t is well established that the legal and equitable estates must be separated; the former being vested in the trustee and the latter in the beneficiary." *Perfect Union Lodge*, 748 S.W.2d at 220. However, "[i]t is not absolutely necessary that legal title be granted to the trustee in specific terms." *Id.* Furthermore, "[p]roperty may be added to an existing trust from any source in any manner unless the addition is prohibited by the terms of the trust or the property is unacceptable to the trustee." TEX. PROP. CODE ANN. § 112.006.

An express trust establishes "a fiduciary relationship with respect to property which arises as a manifestation by the settlor of an intention to create the relationship and which subjects the person holding title to the property to equitable duties to deal with the property for the benefit of another person."[9] *Id.* § 111.004(4). "The trustee shall administer the trust in good faith according to its terms . . . ." *Id.* § 113.051. "[I]n administering the trust[,] the trustee shall perform all of the duties imposed on trustees by the common law." *Id.* "The trustee is accountable to a beneficiary for the trust property and for any profit made by the trustee through or arising out of the administration of the trust, even though the profit does not result from a breach of trust[.]" *Id.* § 114.001(a). A trustee is liable for "any damages resulting from" a breach of trust, including lost trust property, profit to the trustee, and profit the trust would have realized without breach. *Id.* § 114.001(c); *see also Williams v. Williams*, No. 03-21-00109-CV, 2022 WL 16702520, at *3 (Tex. App.—Austin Nov. 4, 2022, no pet.) (mem. op.).

### 2. Intent to Form a Trust & Transfer of Assets

Appellants first argue that Nim did not express an intent to create a trust based on his testimony that it was not his intention that the assets would be in Paco's name. Relatedly, appellants argue that a trust was never formed because Nim did not actually transfer assets to Paco. We disagree on both counts.

Nim testified that in 1997 Paco "practically begged" Nim to let Paco become Nim's "money manager." Nim gave Paco power of attorney so that Paco could take over

---

[9] A power of attorney also creates a fiduciary relationship. *In re Estate of Miller*, 446 S.W.3d 445, 454–55 (Tex. App.—Tyler 2014, no pet.) (first citing *Vogt v. Warnock*, 107 S.W.3d 778, 782 (Tex. App.—El Paso 2003, pet. denied); and then citing *Plummer v. Estate of Plummer*, 51 S.W.3d 840, 842 (Tex. App.— Texarkana 2001, pet. denied)). AMT did not bring a claim for breach of fiduciary duty on this basis. The record reflects that Paco no longer held Nim's power of attorney in 2019 when the breach was alleged to have occurred.

13

managing $1.3 million of assets held at First Tennessee. Paco, using his power of attorney, transferred Nim's assets to the Popperian fund and Schwab account. After the transfer was complete, Nim disclaimed having any access to the assets. Paco acknowledged that he had complete control over Nim's assets, which Paco exercised by allocating the investments in Nim's accounts and initiating annual gift transfers to himself, Leesie, and others. Nim did not describe transferring his property to Paco as trustee. However, "[t]echnical words of expression . . . are not essential for the creation of a trust, [and] [i]t is not absolutely necessary that legal title be granted to the trustee in specific terms." *Perfect Union Lodge*, 748 S.W.2d at 220. While Nim did not describe a transfer of legal title in explaining the agreement, Nim clearly identified the beneficiary—Nim; the res—Nim's First Tennessee assets; and the trust purpose—the management and investment of Nim's holdings. *See id.* Paco's own representations confirmed the intent of the parties—"I'm going to continue to legally transfer as much of Nim's estate as I can into my own name"; "any money I move into my name from Nim's accounts I intend to keep in my name until he needs me to help him out"; "I've been managing [Nim's] money for four years." *See id.*; *see also In re Borbidge*, 90 B.R. 728, 735 (Bankr. E.D. Pa. 1988), *aff'd sub nom. Eckell v. Borbidge*, 114 B.R. 63 (E.D. Pa. 1990) (concluding that an oral trust was intended based on testimony by son "that his mother gave him control and access to her assets to be exercised for her benefit"). Viewing the evidence in the light most favorable to the verdict, we conclude that the record would enable reasonable and fair-minded people to find that Nim intended to create an express trust. *See City of Keller*, 168 S.W.3d at 827. Further, in examining the entire record, considering all the evidence both in favor of and contrary to the challenged finding, we conclude that this finding is not

14

so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Vast Constr.,* 526 S.W.3d at 723; *Bennett*, 489 S.W.3d at 66.

Even with evidence of intent, we must examine whether Nim transferred trust property to Paco. To constitute a transfer, "legal and equitable estates must be separated." *Perfect Union Lodge*, 748 S.W.2d at 220; *see Long v. Long*, 252 S.W.2d 235, 247 (Tex. App.—Texarkana 1952, writ ref'd n.r.e.) ("In any active trust the legal title and right of possession are vested in the trustee, and the beneficiary has the equitable title only, without possession or right of possession."). Appellants argue that the initial transfer of Nim's inheritance to the Schwab account and Popperian fund did not create a trust because those accounts were legally held by Nim. AMT responds that Paco's exercise of complete control over Nim's assets was sufficient, and at any rate, Paco held legal title to the trust assets at a later date.

First, we note that the intent to create a trust and the transfer of trust property need not occur simultaneously. Rather, an oral trust in personal property may arise where there is "a transfer of the trust property to a trustee. . . if the transferor expresses simultaneously with *or prior to the transfer* the intention to create a trust." TEX. PROP. CODE ANN. § 112.001(1) (emphasis added). In 2001, Paco transferred Nim's assets, valued at $189,000 in the Popperian fund, to himself, which he later liquidated to invest in real estate on Nim's behalf.[10] In 2005, Paco transferred what remained of Nim's initial $1.3 million dollar inheritance—various stocks and securities—from Nim's Schwab account to his own account. At both points, the separation of legal and equitable title was clearly

---

[10] AMT did not produce evidence tracing any disputed assets to the proceeds of Paco's liquidation of the Popperian account. We reference the Popperian account only to the extent it is relevant to the transfer of the trust res.

established, and the trust was perfected. *See id.* Paco liquidated the Schwab holdings into cash held in his individual account. This money remained part of the trust res. *See id.* § 116.161(2) (providing that "money or other property received from the sale . . . of a principal asset" "shall" be allocated to the principal of the trust).

Second, we note that Nim continued to transfer assets to Paco after Paco liquidated the Schwab account in 2005. Nim contributed an additional $208,000 in cash for Paco to keep their real estate investments afloat. Paco deposited these funds into accounts owned by him or his alter ego—the Copernican. *See id.* § 112.006 ("Property may be added to an existing trust from any source in any manner unless the addition is prohibited by the terms of the trust or the property is unacceptable to the trustee.").

We conclude that the evidence is both legally and factually sufficient that Nim intended to create an express trust and that he transferred the trust property to Paco as trustee.[11] *See City of Keller*, 168 S.W.3d at 827; *Vast Constr.,* 526 S.W.3d at 723; *Bennett*, 489 S.W.3d at 66.

### 4.    Merger

Next, appellants argue that "any trust duties would have terminated by merger" when Nim's assets were deposited into the Schwab account. Appellants assert that because Nim held both legal and equitable title, he held the assets free of trust. *See* TEX. PROP. CODE ANN. § 112.034(a) ("If a settlor transfers both the legal title and all equitable interests in property to the same person or retains both the legal title and all equitable

---

[11] Under our factual sufficiency review, we acknowledge Paco's testimony that Nim gifted the remainder of his estate to him in 2005 and that he did not hold any of Nim's assets at that time. We presume the jury disregarded this testimony which was contrary to its verdict. *See City of Keller*, 168 S.W.3d at 819. We also conclude that Paco's testimony is not evidence that is so contrary to the overwhelming weight of the evidence that the jury's findings are clearly wrong and unjust. *See Bennett*, 489 S.W.3d at 66.

16

interests in property in himself as both the sole trustee and the sole beneficiary, a trust is not created and the transferee holds the property as his own."). However, this argument rests on the assumption that the transfer of trust assets could have only occurred in 1997. For the reasons discussed *supra*, there was legally and factually sufficient evidence that Paco held legal title to trust assets since as early as 2001, which he has never relinquished. Therefore, we find this argument unavailing.

### 5. Existence of Trust Assets

#### a. Schwab Account

Appellants argue that Nim's Schwab account was not a trust asset because it was not held in trust by Paco. This is a variation of appellants' previous arguments regarding transfer and merger, and we reject it for the reasons stated above—Paco held legal title after transferring the Popperian fund and Schwab account assets into his own account.

#### b. Real Estate

Appellants next argue that the Park City property is not a trust asset because the Copernican held legal title, not Paco. However, this argument ignores the jury's finding that the Copernican is the alter ego of Paco. An alter-ego finding allows a court to pierce the corporate veil by holding a shareholder liable for the corporation's debt, "effectively placing the shareholder in the shoes of the corporation." *Yamin v. Carroll Wayne Conn, L.P.*, 574 S.W.3d 50, 66 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). "In a reverse veil-piercing case, the roles are reversed, and it is the corporation that is held liable for the shareholder's debt or otherwise substituted for the shareholder." *Id.* Under this principle, the corporation and the individual are treated as one in the same. *See Zahra Spiritual Tr. v. U.S.*, 910 F.2d 240, 243–44 (5th Cir. 1990) (applying Texas law and

concluding that a creditor is allowed to reach the assets of a corporation when there is a showing that an alter ego relationship exists between the individual debtor and the corporation); *see also Rocklon, LLC v. Paris*, No. 09-16-00070-CV, 2016 WL 6110911, at *3–4 (Tex. App.—Beaumont Oct. 20, 2016, no pet.) (mem. op.) (citing *Zahra Spiritual Trust*, 910 F.2d at 243–44). Appellants do not challenge the jury's alter-ego finding. Therefore, the Copernican and Paco are treated as one in the same, and the Park City property is properly considered to be held by Paco.

Next, appellants argue that 4602 Rosedale and 4410 Burnet were not trust assets because they were titled to Paco individually and not as trustee. Appellants cite no authority, and we have found none, concluding that a trustee's unilateral act of titling property under his name individually without designating his role as trustee changes the nature of the trust property. *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."). Having been provided no authority to adopt this rule, we decline to do so. We also note that Paco having legal title to the assets is entirely consistent with the requirement for separation of legal and equitable ownership of trust property. *See Burns v. Miller, Hiersche, Martens & Hayward, P.C.*, 948 S.W.2d 317, 322 (Tex. App.—Dallas 1997, writ denied) ("The trustee of a trust holds bare legal title and the right to possession of trust assets, while the beneficiary is considered the real owner of the property, holding equitable or beneficial title." (citing *Hallmark v. Port/Cooper–T. Smith Stevedoring Co.*, 907 S.W.2d 586, 589 (Tex. App.—Corpus Christi–Edinburg 1995, no writ))).

Next, appellants argue that the statute of frauds bars the enforcement of the oral trust. We disagree. As noted above, the Trust Code's statute of frauds provision permits the enforcement of oral trusts if the trust consists of personal property at its *creation*. *See* TEX. PROP. CODE ANN. § 112.004(1) ("A trust consisting of personal property . . . is enforceable if *created by* . . . a transfer of the trust property to a trustee who is neither settlor nor beneficiary . . . .") (emphasis added). If the settlor funds the oral trust with personal property, the trustee cannot render the entire trust unenforceable by later converting the trust assets to real property. *See* Elizabeth Deleery et al., *Bogert's The Law of Trusts and Trustees* § 65 n.17 (2022) ("It would be a dangerous precedent to lay down as law that a trustee could take trust funds, invest them in real property and thereby defeat the trust." (quoting *Tucker v. Brown*, 150 P.2d 604 (Wash. 1944))). Further, regardless of the application of the statute of frauds to an oral express trust, its application "is not a bar to the establishment of a constructive trust, since such trusts may be proved by parol." *Troxel v. Bishop*, 201 S.W.3d 290, 297 (Tex. App.—Dallas 2006, no pet.) (citing *Fain v. Beaver*, 478 S.W.2d 816, 820 (Tex. App.—Waco 1972, writ ref'd n.r.e.)). As we note throughout this opinion, the res of the express trust consists of substantial personal property. To the extent that Paco converted the personal property to real estate, a constructive trust may still attach to the property. *See id.*

### c. Bitcoin

Appellants assert that there is insufficient evidence that any Bitcoin held by Paco in October 2019 is a trust asset because AMT's expert witness could no longer trace Paco's holdings after February 2018 due to Paco's "washing" of Bitcoin.

Again, appellants cite no legal authority for the proposition that a defendant may render evidence insufficient by making disputed assets untraceable, and we have found none. *See* TEX. R. APP. P. 38.1(i). Were we to accept appellant's position, we would be providing a perverse incentive for trustees to avoid liability for their fiduciary breaches by making trust assets untraceable. Therefore, we decline to do so. At any rate, we note that there was evidence that Paco continued to hold "a couple thousand" Bitcoin as late as June 2019, and there was no evidence that he sold that Bitcoin before October 2019.

### d. Gold

Next, appellants argue there was insufficient evidence that Paco held any gold in trust in October 2019. Appellants cite Paco's testimony that he only held gold for his daughter. Appellants state that there was no contrary evidence. We disagree.

Paco testified that he purchased hundreds of ounces of gold funded by the proceeds from 4410 Burnett. *See* TEX. PROP. CODE ANN. § 116.161(2) ("[M]oney or other property received from the sale . . . of a principal asset" "shall" be allocated to the principal of the trust.). We must presume the jury disregarded Paco's testimony that any gold he held was his daughter's. *See City of Keller*, 168 S.W.3d at 819. Further, the jury could have reasonably determined that the gold Paco held at the time of trial was the same gold Paco purchased with trust proceeds. *See id.*

### e. Summary

In summary, we conclude that the evidence would enable reasonable and fair-minded people to find that the disputed assets were trust assets. *See City of Keller*, 168 S.W.3d at 827. Further, in examining the entire record, considering all the evidence both in favor of and contrary to the challenged finding, we conclude that this finding is not so

20

contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Vast Constr.,* 526 S.W.3d at 723; *Bennett*, 489 S.W.3d at 66.

## C.    Informal Fiduciary Duty

Appellants also challenge the sufficiency of the evidence supporting AMT's breach of informal fiduciary duty claim. While the express trust claim supports all the relief awarded to AMT, we will proceed to address this argument for the sake of judicial efficiency. First, appellants argue that this claim mirrors the trust claim, and it must fail for similar reasons. Having previously rejected those arguments, we find this contention unavailing. In any event, a breach of informal fiduciary duty claim is distinct from a breach of express trust fiduciary claim. *See Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex. 2005) (contrasting formal fiduciary relationships such as that between a trustee and beneficiary from informal fiduciary relationships).

Next, appellants challenge whether there is sufficient evidence of a relationship that would give rise to an informal fiduciary duty. Appellants contend there was no relationship of trust and confidence prior to and apart from the 1997 agreement and that assuming such a relationship existed, it ended before the alleged breach on October 15, 2019, because Nim and Paco's relationship had recently become adversarial in nature, such that Nim was discussing his financial affairs with Leesie instead.

### 1.    Applicable Law

"The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006,

21

pet. denied). A fiduciary relationship may arise from formal and informal relationships. *Lundy v. Masson*, 260 S.W.3d 482, 501–02 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (citing *Cotten v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 698 (Tex. App.—Fort Worth 2006, pet. denied)). Fiduciary duties arise as a matter of law in certain formal relationships, including attorney-client and trustee relationships. *Cathey*, 167 S.W.3d at 330. In contrast, an informal fiduciary duty may arise from a moral, social, domestic, or purely personal relationship of trust and confidence. *Id.* Such a confidential relationship exists where influence has been acquired and abused and confidence has been extended and betrayed. *Cotten*, 187 S.W.3d at 698. To impose an informal fiduciary duty, the relationship of trust and confidence must exist prior to, and apart from, the agreement that is the basis of the suit. *Id.* "A familial relationship, while considered a factor, does not by itself establish a fiduciary relationship." *Gray v. Sangrey*, 428 S.W.3d 311, 316 (Tex. App.—Texarkana 2014, pet. denied) (citing *Tex. Bank & Tr. Co. v. Moore*, 595 S.W.2d 502, 508 (Tex. 1980)). Whether a confidential relationship exists is "determined from the actualities of the relationship between the persons involved." *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962). This determination is ordinarily a question of fact for the jury. *Cotten*, 187 S.W.3d at 698.

### 2. Analysis

Nim testified that his relationship with Paco was closer than a typical father son relationship—"we were good buddies." Paco confirmed that he had referred to Nim as his best friend. Nim stated that this relationship existed for years before Paco approached him in 1997 to manage his assets. Nim did not consider the 1997 agreement to be a business deal, but a "family relationship." Nim fully trusted Paco to manage his assets,

22

and Paco testified that the trust was justified. Nim stated that he trusted and relied on Paco's judgment prior to the 1997 agreement. After 1997, Nim would sign various documents at Paco's instruction to facilitate Paco's managing of Nim's wealth. Nim continued to trust Paco as he informed Nim he was investing Nim's assets in real estate, gold, and then Bitcoin. Until Paco's refusal to return Nim's property in October 2019, Paco never refuted that he was managing Nim's assets. In a February 3, 2020 e-mail from Nim to Paco, Nim describes his reaction to Paco's refusal:

> Imagine my wonder. After putting up with your irrational conduct for years; after 20 plus years of trusting you to manage my retirement, my inheritance, my investments, my car, my home in El Paso and most recently my Social Security and Scripps pension; to ultimately be at your mercy with no home of my own; to have you tell me time and again that everything I put into each enterprise: real estate and gold and bitcoin, would ultimately benefit us all, together; to see my wealth grow and watch you prosper from it, imagine my confusion this fall, having you deny me the right to my own money when I have been offered an opportunity to get out from under your thumb. It is astonishing.

On the question of whether an informal fiduciary relationship existed prior to and apart from the 1997 agreement, we find instructive the Texas Supreme Court's opinion in *Moore*, 595 S.W.2d 502. In that case, A.E. Moore handled the financial affairs of his elderly aunt, Maggie Dove Littell. *Id.* at 505. Moore gained control of her accounts—first, as her agent under a power of attorney; and then, as co-owner of the accounts. *Id.* Moore would ask Littell to sign various documents, telling her that he needed the signature for medical expenses and home repairs. *Id.* Littell told others that she relied upon and trusted Moore. *Id.* After Littell passed away, Moore transferred the funds in several of his aunt's accounts to his own. *Id.* at 505–06. The administrator of Littell's will filed suit against Moore to recover property for the estate. *Id.* at 504. A jury determined that Littell did not

23

intend to gift Moore the funds in her accounts. *Id.* at 506. The trial court later entered a judgment that Littell's estate recover the transferred funds to Moore. *Id.* at 506–07.

The Texas Supreme Court affirmed the trial court's judgment, holding that a fiduciary relationship existed between Moore and Littell, which created a presumption of "unfairness and invalidity of the transactions in question[.]" *Id.* at 507. The court noted that "the relationship of [Littell] and Moore that of aunt and nephew together with Moore's assistance to [Littell,] do not, standing alone, establish a fiduciary relationship." *Id.* at 508. However, it reasoned "that [the] fact of a family relationship should not of itself establish an exception to the accepted rule that where trust is reposed and substantial benefits gained equity will recognize that the beneficiary in such transactions is a fiduciary[.]" *Id.* The court held under those facts that "Moore consented to have his conduct measured by the standards of the finer loyalties exacted by courts of equity." *Id.* at 509.

Here, the evidence shows a familial relationship, one perhaps closer than that in *Moore*. Paco exercised extensive control of Nim's assets—first, through a power of attorney; and then, by transferring Nim's assets to Paco's own account, liquidating those assets, and converting them to assets for which he and his alter ego retained legal title. Both prior to and throughout the time Paco controlled Nim's assets, Nim trusted Paco fully, relying upon Paco to manage his assets for Nim's benefit. As the years progressed, Nim became more dependent on Paco—ultimately residing with Paco, having sold his own residence at Paco's urging. Nim continued to believe Paco was acting in his best interest until Paco refused to return Nim's assets, stating that he did not owe Nim anything.

24

We conclude that the evidence would enable reasonable and fair-minded people, looking at the actualities of the relationship involved, *see Thigpen*, 363 S.W.2d at 253, to find the existence of an informal fiduciary relationship existing both prior to and apart from the 1997 agreement and extending through October 15, 2019. *See City of Keller*, 168 S.W.3d at 827; *see also Gray*, 428 S.W.3d at 317 (concluding that there existed an informal fiduciary relationship between mother and daughter where there was a pattern of care and assistance by the daughter that continued and intensified as mother aged and moved next door to daughter). Further, in examining the entire record, considering all the evidence both in favor of and contrary to the challenged finding, we conclude that this finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Vast Constr.,* 526 S.W.3d at 723; *Bennett*, 489 S.W.3d at 66.

**D.    Unjust Enrichment**

Appellants argue that the unjust enrichment claim does not independently support the imposition of a constructive trust. Because we have concluded that there is sufficient evidence supporting AMT's express trust and informal fiduciary duty theories of liability, resolving this argument is not necessary to the disposition of the appeal. *See* TEX. R. APP. P. 47.1. Nevertheless, we note that while unjust enrichment may not be an independent cause of action, *see Mowbray v. Avery*, 76 S.W.3d 663, 680 (Tex. App.—Corpus Christi–Edinburg 2002, pet. denied); *Oxford Fin. Companies, Inc. v. Velez,* 807 S.W.2d 460, 465 (Tex. App.—Austin 1991, writ denied) ("Unjust enrichment is not an independent cause of action[.]"); *see also Watson v. City of San Marcos*, No. 03-22-00307-CV, 2023 WL 3010938, at *3 (Tex. App.—Austin Apr. 20, 2023, no pet. h.) (mem. op.) (holding same), a constructive trust may lie on the legal theory of unjust enrichment. *See KCM Fin. LLC*

25

*v. Bradshaw*, 457 S.W.3d 70, 87 (Tex. 2015). We address the propriety of the trial court's constructive trust award below.

**E.    Constructive Trust**

Appellants argue that AMT failed to prove an identifiable res; therefore, the constructive trust was not attached to definitive property. Appellants' arguments are mostly similar to those we previously addressed in our discussion of the express trust.

**1.    Applicable Law**

"A constructive trust is an equitable, court-created remedy designed to prevent unjust enrichment." *Id.* Imposition of a constructive trust "generally requires" that the requesting party establish: (1) breach of a special trust or fiduciary relationship or actual or constructive fraud, (2) unjust enrichment, and (3) an identifiable res that can be traced back to the original property. *Id.* Further, the trust code provides that a trial court may impose a constructive trust on trust property as a remedy for a breach of trust. TEX. PROP. CODE. ANN. § 114.008(a)(9). "To prove an identifiable res, the proponent of the constructive trust must show that the specific property that is subject to the constructive trust is the same property—or the proceeds from the sale thereof or revenues therefrom—that was somehow wrongfully taken." *In re Hayward*, 480 S.W.3d 48, 52 (Tex. App.—Fort Worth 2015, no pet.) (citing *Wheeler v. Blacklands Prod. Credit Ass'n*, 627 S.W.2d 846, 851 (Tex. App.—Fort Worth 1982, no writ)). "A party seeking to impose a constructive trust has the initial burden of tracing funds to the specific property sought to be recovered." *Wilz v. Flournoy*, 228 S.W.3d 674, 676 (Tex. 2007) (citing *Meyers v. Baylor Univ.*, 6 S.W.2d 393, 394–95 (Tex. App.—Dallas 1928, writ ref'd)). The tracing requirement ceases once the trustee "mingles the trust funds with his own property or invests it in such

26

a manner that the trust funds can no longer be separated or identified." *In re Marriage of Harrison*, 310 S.W.3d 209, 213 (Tex. App.—Amarillo 2010, pet. denied). If this occurs, "the entire property will be treated as subject to the trust, except insofar as the trustee can distinguish and separate that which is his own." *Id.* (citing *Wilz*, 228 S.W.3d at 676).

### 2. Analysis

AMT identified definite Bitcoin that Paco obtained from the sale of 4410 Burnet, which was trust property. According to Clegg, of this Bitcoin, Paco still held 2,299 Bitcoin in February 2018, before he began to conceal his holdings by using CoinJoin. Thus, AMT met its burden to identify a definite res traceable to trust proceeds. *See Wilz*, 228 S.W.3d at 676; *In re Heyward,* 480 S.W.3d at 52. And once Paco concealed the Bitcoin so that it could no longer be identified, AMT's tracing burden ceased. *See In re Marriage of Harrison*, 310 S.W.3d at 213.

With respect to gold, AMT presented evidence that Paco acquired hundreds of ounces of gold with trust proceeds. Paco admitted at trial that he held gold at his Park City residence. Therefore, AMT met its burden to show a definite res traceable to trust proceeds. *See Wilz*, 228 S.W.3d at 676; *In re Heyward,* 480 S.W.3d at 52. Furthermore, Paco produced no evidence that he held any gold acquired with non-trust proceeds; therefore, the constructive trust properly attached to all gold held by Paco. *See In re Hayward*, 480 S.W.3d at 52.

We have previously concluded that there is legally and factually sufficient evidence that the Park City and 4602 Rosedale properties were acquired with trust proceeds. A constructive trust over these properties is a statutorily authorized remedy. *See* TEX. PROP. CODE. ANN. § 114.008(a)(9).

**F.      Profit Disgorgement**

Next, appellants argue that there was insufficient evidence supporting the trial court's profit finding. Appellants further maintain that we must reverse and remand the award for the trial court "to evaluate the equites in the first instance."

**1.      Applicable Law**

Profit disgorgement is an available remedy for the breach of a fiduciary duty. *Longview Ener. Co. v. Huff Ener. Fund LP*, 533 S.W.3d 866, 877–78 (Tex. 2017). Furthermore, under the trust code, "[a] trustee who commits a breach of trust is chargeable with any damages resulting from such breach of trust, including . . . any profit made by the trustee through the breach of trust[.]" TEX. PROP. CODE ANN. § 114.001(c)(2). A profit award does not have to be susceptible to an exact calculation, but the amount must be shown by competent evidence with reasonable certainty. *Saden v. Smith*, 415 S.W.3d 450, 466 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (citing *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992)). The profit award must be based on objective data from which the amount can be ascertained. *Id.* (citing *Heine*, 835 S.W.2d at 84). A profit calculation "must be based on net profits, not gross revenue or gross profits." *Kellmann v. Workstation Integrations, Inc.*, 332 S.W.3d 679, 684 (Tex. App.— Houston [14th Dist.] 2010, no pet.).

A jury does not determine the expediency, necessity, or propriety of equitable relief such as profit disgorgement. *Longview*, 533 S.W.3d at 874 (citing *Burrow v. Arce*, 997 S.W.2d 229, 245 (Tex. 1999)). Whether equitable relief should be afforded "must be determined by a court based on the equity of the circumstances." *Id.* (quoting *Burrow*, 997 S.W.2d at 245). "The scope and application of equitable relief . . . 'is generally left to

28

the discretion of the court imposing it.'" *Id.* (quoting *Baker Botts, L.L.P. v. Cailloux*, 224 S.W.3d 723, 736 (Tex. App.—San Antonio 2007, pet. denied)).

### 2. Analysis

Appellants argue there was no evidence of revenues and costs to enable the jury to make a profit finding. However, as previously noted, the jury's determination of profit was based on the calculation of the appreciation in Bitcoin that Paco withheld from Nim from the time of Paco's breach to the date of trial. While a profit calculation necessarily contemplates accounting for expenses, such a consideration is unnecessary here when Paco was simply holding an appreciating asset. *See Kellmann*, 332 S.W.3d at 684. Further, the profit award was based on objective data regarding the number of Bitcoin wrongfully withheld by Paco multiplied by the increase in value over the pertinent time period. *See Saden*, 415 S.W.3d at 466. We conclude that the jury's profit finding was supported by competent evidence. *See id.*

Next, appellants argue that the Bitcoin should have been valued at the time of breach—not the time of trial—in calculating Paco's profits. Appellants cite a rule of law applying to contract damages. *See Miga v. Jensen*, 96 S.W.3d 207, 214 (Tex. 2002) ("But the rule in Texas has long been that contract damages are measured at the time of breach, and not by the bargained-for goods' market gain as of the time of trial."). However, appellants cite no authority applying this limitation to a breach of fiduciary duty claim, and we have found none. *See* TEX. R. APP. P. 38.1(i). Rather, "[u]nlike a contract case, the law favors granting the benefit of the delay to the victim of the fraud." *Allen v. Devon Energy Holdings, L.L.C.*, 367 S.W.3d 355, 409 (Tex. App.—Houston [1st Dist.] 2012, pet. granted, judgm't vacated w.r.m) (citing *Janigan v. Taylor*, 344 F.2d 781, 786 (1st Cir.

29

1965) ("[O]nce it is found that [the defendant] acquired the property by fraud, that the profit was the proximate consequence of the fraud, whether foreseeable or not, it is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them.")).

Finally, appellants argue that we must remand to the trial court so that it can determine whether profit disgorgement is equitable. We note that there was ample evidence before the trial court to assess the equities in this case, and there is no indication that in awarding profit disgorgement in its final judgment that the trial court failed to do so. *See Longview*, 533 S.W.3d at 874.

## G. Attorney's Fees and Prejudgment Interest

Finally, appellants argue that attorney's fees and prejudgment interest cannot survive should this Court reverse the express trust claim. Because we have affirmed that claim, this argument necessarily fails. Appellants further contend that awarding prejudgment interest on profit disgorgement is improper. However, appellants cite no authority for this proposition, and we have found none. *See* TEX. R. APP. P. 38.1(i). Therefore, we reject this argument.

## H. Summary

For the foregoing reasons, we conclude that each of the challenged claims and remedies are supported by legally and factually sufficient evidence. *See City of Keller*, 168 S.W.3d at 827; *Vast Constr.,* 526 S.W.3d at 723; *Bennett*, 489 S.W.3d at 66. As reframed, we overrule appellants' first issue in its entirety.

## III.    SUMMARY JUDGMENT

In its second issue, appellants argue that the trial court erred in granting AMT's no-evidence summary judgment motion and dismissing appellants' statute of frauds and limitations defenses.

## A.    Standard of Review

We review a trial court's granting of summary judgment de novo. *Eagle Oil & Gas Co. v. TRO-X, L.P.*, 619 S.W.3d 699, 705 (Tex. 2021); *Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013) (per curiam). "We review the summary judgment record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion." *Eagle Oil*, 619 S.W.3d at 705; *see Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 756 (Tex. 2007) (per curiam).

After an adequate time for discovery, a party may file a "no-evidence" motion for summary judgment asserting there is no evidence of one or more essential elements of a claim or defense on which the adverse party would have the burden of proof at trial. TEX. R. CIV. P. 166a(i). "A no-evidence motion for summary judgment immediately shifts the burden to the nonmovant." *Energen Res. Corp. v. Wallace*, 642 S.W.3d 502, 514 (Tex. 2022). "To defeat a no-evidence motion, the non-movant must produce evidence raising a genuine issue of material fact as to the challenged elements." *Parker*, 514 S.W.3d at 220. "A genuine issue of material fact exists if more than a scintilla of evidence establishing the existence of the challenged element is produced." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). "[M]ore than a scintilla of evidence exists if the evidence 'rises to a level that would enable reasonable and fair-minded people to

31

differ in their conclusions.'" *Id.* at 601 (quoting *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)).

## B.      Statute of Frauds

Appellants argue that the trial court erred in granting no-evidence summary judgment on its statute of frauds defense to AMT's trust claim because the trust assets contained real property. We previously concluded that AMT's express trust claim was not barred by the statute of frauds. For the same reasons, we conclude that the trial court did not err in dismissing this defense. Appellants presented no evidence in its summary judgment response that the oral trust did not consist entirely of personal property at its creation. *See* TEX. PROP. CODE ANN. § 112.004(1) ("A trust consisting of personal property . . . is enforceable if *created by* . . . a transfer of the trust property to a trustee who is neither settlor nor beneficiary if the transferor expresses simultaneously with or prior to the transfer the intention to create a trust.") (emphasis added). Paco's later conversion of Nim's assets to real property does not render the entire trust unenforceable. *See* Deleery et al., *supra*, at § 65 n.17. We conclude that the trial court did not err in granting summary judgment on appellants' statute of frauds defense. *See Eagle Oil & Gas Co.*, 619 S.W.3d at 705.

## C.      Limitations

Appellants argue that they submitted evidence that AMT's claims accrued more than four years before suit was filed, citing allegations of Paco's past improprieties. However, AMT did not bring any claims seeking to recover for Paco's past breaches. AMT's claim related solely to Paco's alleged breach of fiduciary duty in October 2019 when he refused to return Nim's property. AMT filed suit in March 2020, well within the

32

applicable limitations period. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(a)(5) (providing that a four-year limitations period is applicable to breach of fiduciary duty claims). Appellants presented no evidence that AMT's pleaded claims were barred by limitations, and they cannot present a fact issue by pointing out that certain un-pleaded claims might be time barred.

We conclude that the trial court did not err in granting summary judgment on appellants' limitations defense. *See Eagle Oil & Gas Co.*, 619 S.W.3d at 705. We overrule appellants' second issue.

## IV.    JURY INSTRUCTION

In their third issue, appellants argue that the trial erred by refusing their requested jury instructions.

## A.    Standard of Review

"A trial court has broad discretion in constructing the charge, so long as it is legally correct." *Emerson Elec. Co. v. Johnson*, 627 S.W.3d 197, 208 (Tex. 2021) (citing *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 664 (Tex. 1999)). Therefore, "[w]e review a trial court's decision to submit or refuse a particular instruction in its charge for an abuse of discretion." *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012); *Dall. Area Rapid Transit v. Morris*, 434 S.W.3d 752, 757 (Tex. App.—Dallas 2014, pet. denied). A trial court abuses its discretion when it acts in an arbitrary manner without reference to any guiding rules or principles. *Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 687 (Tex. 2002).

A trial court may "personalize or individualize the charge to the facts of the case so the jury can more easily understand the law." *U.S. Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 220 (Tex. App.—Waco 1993, writ denied);

33

*see also Grumbles v. Ineos USA, LLC*, No. 13-18-00316-CV, 2019 WL 2622339, at *4 (Tex. App.—Corpus Christi–Edinburg June 27, 2019, pet. denied) (mem. op.). "An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Thota*, 366 S.W.3d at 687 (quoting *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855–56 (Tex. 2009)); *see Morris*, 434 S.W.3d at 758.

We will not reverse a jury verdict based on charge error unless the error "probably caused the rendition of an improper judgment" or "probably prevented the petitioner from properly presenting the case to the appellate courts." TEX. R. APP. P. 61.1; *see Emerson Elec.*, 627 S.W.3d at 208.

## B. Tracing

Appellants argue that the jury was not properly instructed regarding asset tracing. The jury was asked whether *any* of Nim's assets were used to acquire the disputed assets. Appellants maintain that this instruction was erroneous because it fails to distinguish between trust and non-trust assets. Appellants' proffered instruction would have defined "trust assets" as "property placed in trust by being transferred from [Nim] to [Paco] as trustee for [Nim] or property otherwise transferred to or acquired or retained by the trustee for the trust." We disagree that the trial court's instruction was erroneous.

The trial court's instruction finds support in both the pleadings and evidence, which restrict Nim's assertion of ownership to assets that were obtained from the proceeds of Paco's liquidation of Nim's Schwab account in 2005 and Nim's continuing contributions to the real estate investments. Each disputed asset was traceable to these transactions. Nim disclaimed seeking the return of any funds Paco otherwise obtained by gift or

34

deception. The instruction was an accurate statement of law given the state of the pleadings and evidence. *See Thota*, 366 S.W.3d at 687. Therefore, the trial court did not abuse its discretion in instructing the jury as it did. *See id.*

## C.     Profit

Appellants further argue that the jury was not properly instructed on profit. Appellant's proposed instruction would have defined profit as "the difference between a person's revenue and a person's expenses." As we have previously mentioned, there was no evidence Paco incurred any expenses from the appreciation in Bitcoin, which was the basis for the profit award. Therefore, the charge accurately stated the law given the state of the pleadings and evidence, and the trial court did not abuse its discretion by refusing appellants' proposed instruction. *See id.*

## D.     Fiduciary Duty

Next, appellants argue that the jury was not instructed about the necessity of an informal fiduciary duty existing at the time of the breach. The jury was asked if such a relationship existed before October 2019, but not whether it existed at the time of Paco's refusal to return the assets on October 15, 2019, as proposed by appellants. Assuming without deciding that the trial court erred in this regard, we conclude that the error did not "probably cause[] the rendition of an improper judgment" or "probably prevent[] the petitioner from properly presenting the case to the appellate courts." TEX. R. APP. P. 61.1; *see Emerson Elec.,* 627 S.W.3d at 208. Specifically, the charge did not prevent appellants from arguing that there was insufficient evidence of a fiduciary relationship on October 15, 2019, and we have previously concluded there was legally and factually sufficient evidence of such a relationship on that date.

35

**E.      Unjust Enrichment**

Finally, appellants argue that the jury charge contains a *Casteel* error regarding the unjust enrichment question because it asked in the disjunctive whether there was some benefit obtained by "fraud, duress, or undue advantage." *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 381 (Tex. 2000). We disagree.

The jury charge language mirrored the common law definition for unjust enrichment—"A party may recover under an unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Reg'l Specialty Clinic, P.A. v. S.A. Randle & Assocs., P.C.*, 625 S.W.3d 895, 904 (Tex. App.—Houston [14th Dist.] 2021, no pet.) (citing *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992)). "A *Casteel*-type error occurs when the trial court submits a single broad-form liability question incorporating multiple theories of liability and the appellate court cannot determine whether the jury based its verdict on an invalid theory that was improperly submitted." *Diamond Offshore Drilling, Inc. v. Black*, 652 S.W.3d 463, 482 (Tex. App.—Houston [14th Dist.] 2022, no pet.) (citing *Casteel*, 22 S.W.3d at 388). Here, the trial court submitted separate liability questions for the express trust, informal fiduciary duty, and unjust enrichment claims. *Casteel* is not implicated by submitting a distinct theory of liability that is susceptible to different manners of proof. *See Formosa Plastics Corp., USA v. Kajima Intern., Inc.*, 216 S.W.3d 436, 455 (Tex. App.—Corpus Christi–Edinburg 2006, pet. denied) ("*Casteel* does not require a granulated submission as to multiple acts under a single theory of liability."). We conclude that the

trial court did not abuse its discretion in submitting a single unjust enrichment question. *See Thota*, 366 S.W.3d at 687.

## F. Summary

Having rejected each of appellants' challenges to the jury charge, we overrule their third issue.

## V. PERMANENT INJUNCTION

In their fourth issue, appellants argue that a permanent injunction is improper because AMT sought legal remedies. Appellants also argue that the injunction limits their rights to engage in lawful activity relating to the constructive trust assets in which they have an interest. AMT responds that the permanent injunction: (1) protects only the constructive trust assets and not the money judgment portion of the final judgment; and (2) is narrowly and logically tailored to protect the assets while allowing Paco to engage in legitimate Bitcoin transactions.

## A. Standard of Review & Applicable Law

A party seeking a permanent injunction must prove the following: (1) a wrongful act; (2) imminent harm; (3) an irreparable injury; and (4) the absence of an adequate remedy at law. *Cypress Creek EMS v. Dolcefino*, 548 S.W.3d 673, 690 (Tex. App.— Houston [1st Dist.] 2018, pet. denied). In general, harm is irreparable when the harmed party has no adequate remedy at law. *Kennedy v. Gulf Coast Cancer & Diagnostic Ctr. at Se.*, 326 S.W.3d 352, 360 (Tex. App.—Houston [1st Dist.] 2010, no pet.). Usually, money damages are an adequate remedy unless the law considers the loss in question unique or irreplaceable. *Cheniere Energy v. Parallax Enters.*, 585 S.W.3d 70, 76–77 (Tex. App.—Houston [14th Dist.] 2019, pet. dism'd) (en banc). The trust code authorizes the

trial court to "enjoin the trustee from committing a breach of trust[.]" Tᴇx. Pʀᴏᴘ. Cᴏᴅᴇ Aɴɴ. § 114.008(a)(2).

We review the trial court's ruling on a permanent injunction for an abuse of discretion. *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 792 (Tex. 2020) (citing *Operation Rescue-Nat'l v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 975 S.W.2d 546, 560 (Tex. 1998)). The trial court abuses its discretion when it misapplies the law to established facts. *Stewart Beach Condo. Homeowners Ass'n, Inc. v. Gili N Prop Invs., LLC*, 481 S.W.3d 336, 343 (Tex. App.—Houston [1st Dist.] 2015, no pet.). There is no abuse of discretion if some evidence reasonably supports the trial court's decision. *Id.* (citing *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002)). "A trial court abuses its discretion by entering an overly-broad injunction which grants more relief than a plaintiff is entitled to by enjoining a defendant from conducting lawful activities or from exercising legal rights." *Super Starr Int'l, LLC v. Fresh Tex Produce, LLC*, 531 S.W.3d 829, 849 (Tex. App.—Corpus Christi–Edinburg 2017, no pet.) (quoting *Harbor Perfusion, Inc. v. Floyd*, 45 S.W.3d 713, 718 (Tex. App.—Corpus Christi–Edinburg 2001, no pet.)).

## B.    Analysis

The trial court awarded a permanent injunction restraining appellants from "selling, transferring, or encumbering" the constructive trust assets. It also restrains appellants from:

> selling, transferring, or encumbering any cryptocurrency, including [B]itcoin, (i) under the direct or indirect control or ownership of [appellants] as of the date of this judgment (including the proceeds of any such cryptocurrency . . .) or (ii) received from [appellants] after March 13, 2020 [the date appellees filed suit], except as provided in Paragraph 5 [of the permanent injunction.]

Paragraph 5 of the permanent injunction permits appellants to sell cryptocurrency under

38

certain circumstances, conditioned upon AMT's prior written consent and that the sale be "for fair market value in an arm's length transaction" with half of the proceeds to be deposited in the registry of the trial court or at AMT's direction. The permanent injunction lapses upon satisfaction of the judgment.

We conclude that the evidence supports the trial court's implied findings that without an injunction, AMT would suffer an irreparable injury without an adequate remedy at law. Paco went to great lengths to conceal his Bitcoin holdings, which represent the most valuable assets awarded to AMT. Paco continued these efforts after suit was filed. Were Paco not restrained from further transferring or concealing Bitcoin, AMT would be prevented from claiming its interest in the constructive trust asset or satisfying its money judgment. This would render any later judicial action to enforce the judgment meaningless. Therefore, we conclude the evidence reasonably supports the trial court's decision. *See Stewart Beach*, 481 S.W.3d at 343; *see also Skelley v. Hayden*, No. 05-99-00802-CV, 2001 WL 379255, at *12 (Tex. App.—Dallas Apr. 17, 2001, pet. granted, judgm't vacated w.r.m) (mem. op.) (concluding that trial court did not abuse its discretion in awarding a permanent injunction preventing defendant from disposing of assets prior to payment of the judgment where defendant intended to dissipate or hide assets under her control).

We further conclude that the injunction does not prohibit appellants from conducting lawful activities or from exercising their legal rights. *See Super Starr Int'l*, 531 S.W.3d at 849. The permanent injunction permits appellants to sell Bitcoin holdings conditioned upon AMT's prior written consent and that the sale be "for fair market value in an arm's length transaction" with half of the proceeds to be deposited in the registry of

39

the trial court or at AMT's direction. The permanent injunction is narrowly tailored so that both parties can realize their fifty percent interest in the constructive trust assets. *See id.*

Finally, we conclude that the trial court was authorized by the trust code to award a permanent injunction to prevent appellants from committing further breaches of trust by dissipating trust assets. *See* TEX. PROP. CODE ANN. § 114.008(a)(2). For the foregoing reasons, we conclude that the trial court did not abuse its discretion by entering a permanent injunction. *See Pike*, 610 S.W.3d at 792. We overrule appellants' fourth issue.

## VI. JURY ARGUMENT

In their fifth issue, appellants argue that a new trial is warranted because AMT's jury argument injected the issue of Paco's wealth and encouraged the jury to punish Paco with a compensatory award. Appellants did not lodge a contemporaneous objection to the jury arguments, but they raised the issue in their motion for new trial.

### A. Standard of Review & Applicable Law

An issue complaining of an improper jury argument must be preserved by a timely objection and a request for an instruction that the jury disregard the improper remark. *Nguyen v. Myers*, 442 S.W.3d 434, 442 (Tex. App.—Dallas 2013, no pet.) (citing TEX. R. APP. P. 33.1(a)(1)). However, if an improper argument is incurable, a party may complain for the first time in a motion for new trial. *Id.* (citing TEX. R. CIV. P. 324(b)(5)).

"Typically, retraction of the argument or instruction from the court can cure any probable harm, but in rare instances the probable harm or prejudice cannot be cured." *Living Ctrs. of Tex., Inc. v. Peñalver*, 256 S.W.3d 678, 680 (Tex. 2008). An improper argument is incurable if, "by its nature, degree, and extent[,] constitute[s] such error that an instruction from the court or retraction of the argument could not remove its effects."

40

*Id.* at 681. Incurable argument is rare and usually encompasses appeals to racial prejudice; unsupported charges of perjury; unsupported, extreme, and personal attacks on opposing parties and witnesses; or baseless accusations of witness tampering. *Id.* The party claiming incurable harm must persuade the court that, based on the record as a whole, the offensive argument was so extreme that a "juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument." *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009).

## B.    Analysis

Appellants complain of AMT's argument that the jury "pick a fair starting point" for damages and that such an amount "leaves plenty for Paco[.]" Appellants also complain of AMT's purported plea that the jury punish Paco: "Conduct which is rewarded is repeated . . . . Should that conduct be rewarded and repeated or should it stop? . . . There is plenty to go around."

A reference to a party's wealth or a plea to punish a defendant, even if improper, does not fall into any of the categories that courts have recognized as incurable; therefore, appellants failed to preserve the issue by failing to timely object. *See Peñalver*, 256 S.W.3d at 680; *Wilhoite v. Sims*, 401 S.W.3d 752, 763 (Tex. App.—Dallas 2013, no pet.) (concluding that argument was not incurable where it did not fit into any of the previously recognized categories); *see also Bishop Abbey Homes, Ltd. v. Hale*, No. 05-14-01137-CV, 2015 WL 9167799, at *12 (Tex. App.—Dallas Dec. 16, 2015, no pet.) (mem. op.) (concluding that the complaining party was required to timely object to counsel's

41

reference to a party's wealth because it did not fall into a recognized category of incurable comments).

Assuming for the sake of argument that appellants properly preserved the issue, the reference to Paco's wealth in this case was not improper. It may be harmful to introduce evidence of a defendant's wealth when it is not relevant to the issues in the case. *See Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867 (Tex. 2008). However, if evidence of a party's wealth is properly admitted, a party is free to comment on the evidence in jury arguments. *See Zurita v. Lombana*, 322 S.W.3d 463, 483 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (concluding that jury argument regarding wealth was not improper because it was based on matters that were properly in evidence). Here, evidence of Paco's wealth was admitted without objection throughout trial because it was relevant to AMT's claims. AMT did not engage in improper jury argument by commenting on matters properly in evidence. *See id.*

Next, we note that profit "[d]isgorgement is an equitable forfeiture of benefits wrongfully obtained . . . ." *Longview*, 464 S.W.3d at 361. "The main purpose of forfeiture is not to compensate an injured principal, . . . [it] is to protect relationships of trust by discouraging agents' disloyalty." *Burrow*, 997 S.W.2d at 238. Because the relief is not compensatory in nature, we conclude that AMT's plea to the jury to deter Paco's behavior was not an improper argument. *See Bramlett*, 288 S.W.3d at 883. We overrule appellants' fifth issue.

## VII. CONCLUSION

We affirm the trial court's judgment.

42

L. ARON PEÑA JR.
Justice

Delivered and filed on the
15th day of June, 2023.